ALBANY,<br>Dec. 1825.

Renss. Glass<br>Factory<br>v.<br>Reid.

---

The PRESIDENT, DIRECTORS and COMPANY of the Rensselaer Glass Factory, plaintiffs in error,

*against*

JANET REID, administratrix, &c. of JOHN REID, deceased, defendant in error.

On the first of May, 1812, the president, &c. of the Rensselaer Glass Factory, a company engaged extensively in the manufacture of glass, entered into a partnership, for a year, with R. & A., two stockholders, in conducting the concern; R. & A. to make the necessary advances in money, and receive interest. On the 1st of May, 1813, the company appointed R. their general agent, large advances being necessary to carry on their business. No salary was agreed on; but a previous agent had received a salary of

$1250 per annum; and this was no more than a reasonable compensation for R.'s services, while agent, until the factory was destroyed by fire, on the 3d of May, 1815. R. continued agent from the 1st of May, 1813, till his death, in August, 1821; residing in the vicinity of his principals, who occasionally met at his house. During the time of his agency, he made necessary cash advances, in and about carrying on the concerns of the company, to more than $100,000, which he had charged in an account of more than 500 items; and had received in cash nearly the same amount, which he credited in the same book in upwards of 700 items. He never rendered any account to the company; nor did he apprize them that they were in arrear, until the 2d of January, 1819, when he was requested by one or more of the directors to present his account; which request was afterwards repeated by one or more of the directors, but never complied with. On his death, his personal representative claimed interest on the advances, as well as on the salary or compensation for his services; *held*, that she should recover interest upon the advances to the 2d of January, 1819, when he was requested to make out his account, but not after. *Held* also, that she should not recover interest on the salary.

As a general rule, interest is allowable on cash advanced by one for another, though the advances rest in the form of a mutual, current and unliquidated account.

Interest is not allowable on an unliquidated account for work and labor.

The facts before referees, appointed by the court pursuant to the statute, (1 R. L. 516,) may, under the order of the court in which the cause is pending, be entered on the record, and the decision upon them reviewed on error.

Form of a judgment record, on reference pursuant to the statute, (1 R. L. 566.)

The word *account* has no definite legal meaning; and *it seems* that a demand lying in account, is not the criterion for determining whether it shall carry interest. The question is whether the demand itself be liquidated. Per Sandford, Chancellor.

How far the administration of justice is capable of being governed by positive rules. Per Colden, Senator.

Advances of money by one man for another, without an express or implied authority from the latter, will not bind him to pay. Per Colden, Senator.

Courts may compel referees to report the facts before them specially; and a review of their decision upon such a report, is preferable to one on motion founded upon affidavit. Per Spencer, Senator.

History of the law of interest. Per Spencer, Senator.

The authorities, requiring or authorizing the allowance of interest on a debt or demand, classified and arranged under their respective principles of, 1. An agreement expressed or implied; and the latter considered in reference, 1. to the usage of business; 2. to the case where the principal *is to be paid* at a specified time, and there is a default as to the payment· 3. an account liquidated &c. 4. an account rendered and not ob

jected to, &c.; 5. the giving of a void note or bill, or offering security, &c.; II. The allowance of interest by a jury, in their discretion, under the direction of the court, 1. in actions arising *ex delicto*; 2. in actions arising *ex contractu*; with various instances and illustrations under each head; and remarks on the evidence applicable to some of the heads. Per Spencer, Senator.

How far the decisions of the neighboring states are authority here. Per Crary, Senator.

How far the common law of England is binding here; and what is the evidence of that law. Per Spencer and Crary, Senators.

There is no case to be found, where attorneys or solicitors have advanced money for their clients, allowing interest on their account before it is liquidated. Per Crary, Senator.

The legal security of capital is the strongest inducement to its accumulation. Per Crary, Senator.

A note payable on demand carries no interest, till a demand is made by suit, or otherwise. Per Spencer, Senator.

To what extent the common law is flexible. Per Spencer, Senator.

On error from the Supreme Court. The same case in the court below, is reported in 3 Cowen's Rep. 393 to 438.

SUTHERLAND, J. and SAVAGE, Ch. J. assigned the reasons in support of the judgment in the court below, as in 3 Cowen's Rep. 419 to 438.

The case was argued by

*B. F. Butler*, for the plaintiffs in error, and

*S. A. Foot*, for the defendant in error, upon the points made, and authorities cited on their argument in the court below, which see, 3 Cowen, 399 to 419.

Mr. *Foot* also raised the question here, whether a writ of error could be brought to review the decision of referees; which was discussed by the counsel much upon the same grounds as, in the court below, on the motion for a rule requiring the plaintiff below to incorporate the facts of the case in the judgment record. The arguments of the same counsel, on that occasion, are reported in 3 Cowen's Rep. 387, 8, 9, S. C.

The main facts in the case, both as to the preliminary point and the merits, will also be found stated or adverted to by the Chancellor and Senators in delivering their opinions in this Court. In these, some circumstances will be

found stated, especially in the opinion of Spencer, Senator, not mentioned in the former report of the cause.

The record returned, which was admitted to be correct in form, and which was stated to be in due form by Colden, Senator, was thus :

Placita, of October term, 1821 ;—Warrants of attorney ;— Memorandum of October term, 1821 ;—Declaration ;—Plea of the general issue ; which was followed with the usual general notice of set off. The record then proceeded thus :

"Therefore," &c. (award of venire, returnable on the first Monday of January then next.) "At which day, before, &c. at, &c. come the parties aforesaid, by their attorneys aforesaid, and the sheriff hath not sent the writ of the people, to him, in that behalf directed. And hereupon the said Janet Reid, administratrix as aforesaid, gives the said court of the people, here, to understand and be informed, that the trial of the issue in this cause will require the examination of a long account, on the part of her, the said Janet Reid, administratrix as aforesaid ; and the said Janet Reid, administratrix as aforesaid, according to the form of the statute in such case made and provided, prays the court of the people now here, by a rule in that behalf made, to refer this cause to referees, not being less than three persons, to be nominated by the said court of the people now here, to finally hear and examine the matters in controversy, in this cause. And because the said President and Directors of the Rensselaer Glass Factory, do not deny the allegation aforesaid ; but admit the same to be true, therefore, in pursuance of, and according to the aforesaid statute, let it be, by rule for that purpose to be duly entered, referred to James Van Ingen, Gideon Hawley, and Nicholas Bleecker, junior, Esqrs., all of the city of Albany, as referees, to hear and examine the matters in controversy, between the said Janet Reid, administratrix as aforesaid, and the President and Directors of the Rensselaer Glass Factory ; and let the said referees, upon pain of contempt, report thereon to the said court of the people, before the aforesaid Justices thereof, at the city hall of the city of New York, on the first Monday of May next. And the same day is given to the parties aforesaid, at the same place. At which day, before the said

Justices of the Supreme Court of Judicature aforesaid, at the city hall of the city of New-York, come the parties aforesaid by their attorneys aforesaid ; and the referees above mentioned, to wit, James Van Ingen, Gideon Hawley, and Nicholas Bleecker, junior, to whom it was referred to hear and examine the matters in controversy, between the said Janet Reid, administratrix as aforesaid, and the said President and Directors of the Rensselaer Glass Factory, and to report thereupon, now report, that they find there is due to the said Janet Reid, administratrix as aforesaid, from the President and Directors of the Rensselaer Glass Factory, the sum of twelve thousand two hundred and eighteen dollars and eighty four cents, besides her costs and charges, by her about her suit in this behalf expended." [The cause was then continued by *curia advisare vult*, to October term, 1824.] " At which day, &c., at, &c., comes as well, &c. And thereupon, all and singular the premises being seen, &c. it is considered by the same Court, that the said report do stand confirmed ; and it is further considered, that, &c. do recover, &c. her said damages, by the referees aforesaid, in form aforesaid reported ; and also, &c. for her said costs and charges, &c."

A rule of the Supreme Court was, on motion of the counsel for the defendants below, made by that Court, and entered November 13th, 1824, in the words set forth in 3 Cowen's Rep. 389, S. C., which was also certified with the record in this cause ; and in obedience to which, the facts came before this Court, being inserted in the record pursuant to the rule.

Farther particulars, as to the manner in which the merits came here, will be found in the opinions of Colden and Spencer, Senators.

SANDFORD, Chancellor. This case presents several important questions. A preliminary one raised by the counsel for the defendant in error, is, whether the merits of the cause come properly before the Court. A motion was made in the Court below to refer the cause ; which was granted on the usual ground, that it involved the examination of long accounts. The referees heard and reported

*Margin notes:*

ALBANY, Dec. 1825.

Renss. Glass Factory v. Reid

The facts before referees, may be entered on the record; and error brought upon them.

upon the case ; and the Supreme Court, on an examination of the report, after directing certain modifications to be made, rendered judgment for the plaintiff below. They afterwards directed the facts in proof before the referees, to be spread upon the record, so that the defendants below might have them reviewed by this Court, in the same way as if they had been found by a special verdict, or stated in a bill of exceptions. It is now insisted, that not being legally upon the record, they must be disregarded by us, and the record passed upon as containing no more than the usual general history of the cause. I do not think so. The motion to refer in this state, is founded on the statute. It is made on the affidavit of either party that the cause will involve the examination of a long account. It is not founded as in England, on the course and practice of the Court. In such a case, I admit that this history of the facts, might not be properly considered a part of the record. But I cannot believe that the legislature, when they took the cause from a jury without the consent of the party, meant also to deprive him of his remedy by writ of error. Something more than mere implication is, I think, necessary to produce such a consequence ; and I am not aware that the case could be brought before us in any other mode, than the one adopted here. I, therefore, consider the merits properly on the record ; and that it is our duty to pass upon them in the same manner, as if they had come up in the more ordinary way of a special verdict, or bill of exceptions.

[ *The Chancellor here stated the leading facts, as they appeared upon the report.*]

The question is, whether Reid, the intestate, was entitled to interest on his advances of money, as agent for the company. The first inquiry relates to the character of his agency. His appointment was by a very short and general resolution, declaring him agent and nothing more. No instructions were given ; and we are left to infer his powers from the history of his acts, and the acts of the company ; whence it would seem, he was their general agent ; being entrusted with all power necessary and proper for the suc

Character of
Reid's agency.

cessful prosecution of their business. It was found to be a losing concern; but they, notwithstanding, resolved to continue it, and did continue it under his superintendence.

It is objected that the claim against the company, rested in an unliquidated account, which will not carry interest. True, we have such expressions in the books; but they are very indefinite and unsatisfactory. Anything may enter into an account. The sum due on a bond of several years standing, on which there have been various payments, may be said to rest in account, and to be unliquidated. An account is no more than a list or catalogue of items, whether of debts or credits. It seems to me there is no difference, whether the demand upon which interest is claimed, lie in account or in anything else. This cannot be the criterion. If the demand itself be unliquidated, it cannot carry interest; and on the other hand, if it be liquidated it may. Have we any settled law upon this head of inquiry? I have looked into the cases cited, and I find them deplorably inconsistent. But it seems to me, that the courts of Pennsylvania have seized on the true principle. They appear to put the allowance of interest, on the fault of the party who is to pay the money.

The difficulty in the case before us arises from the peculiar state of the facts. There is no reported case like it. It appears to me, however, that the advances of Reid were fairly within the scope of his agency. He was to keep the workmen together, and manage the whole concern. In doing this, he was obliged to make heavy disbursements; and there is no pretence that he did not act in perfect good faith. If the advances were within the scope of his power, this was equivalent to an express authority to make them.

It is urged that he did not render an account, that he was negligent in keeping the company advised as to the state of their business, in point of profit and loss. On this question, the case is very obscure. Some of the directors requested him to account; but there was no formal demand made. The company understood it to be a losing concern. Was he bound to account without any request? I can see no legal duty on his part, to furnish an account, any more than

*(margin notes)*

ALBANY, Dec. 1825.

Renss. Glass Factory v. Reid.

The word account, has no legal definite meaning.

*Semb.* that a demand lying in account, is not the criterion for determining whether it shall carry interest. The question is, whether the demand itself be liquidated.

Character of Reid's agency, and his right to advance money.

As to his duty to render an account

on the part of the company to demand one. So much confidence seems to have been reposed, that they did not think it necessary to call for any account.

With all the obscurity of the case, it is plain that he advanced his money for the use of the company. He was deprived of the use of that money, and the company had the benefit of it, under circumstances which, I think, are equivalent to a request on their part. Indeed, they do not pretend the contrary. To do so, would be to deny him the principal sum.

The chancellor concurs with the reasoning of the Supreme Court; and is for affirmance.

I do not intend to go over the cases cited. I have prepared no written opinion. The reasoning of Ch. J. Savage and Mr. Justice Sutherland, is very able; and to my mind, most satisfactory and conclusive. I can add nothing to the view which they have taken of the subject; and it would be idle to say over again, what they have so well said already. Indeed I do not wish to be considered as departing from the Supreme Court, in any one particular. I am entirely satisfied with the conclusion to which they came; and I hope their judgment will be affirmed.

Contents of the judgment record.

COLDEN, Senator. The documents returned with the writ of error, are a regular record of a judgment of the Supreme Court, on which is entered a declaration in an action on the case, a plea and issue, with a notice of set-off; an order of reference, a report of the referees in favor of the plaintiff below for the sum of $12,218 84; and a judgment of the court for that sum, with $2547 87, costs.

No error in that.

It has not been, and could not be suggested, that in this record there is any error.

History of reference and proceedings of the Supreme Court thereon also returned.

Order to state and enter facts on record.

But there is also returned, with the writ of error, another document, purporting to be a case, which presents a history of the proceedings of the Supreme Court in the same cause; by which it appears that, on the 13th of November, 1824, the Supreme Court made an order, that a statement of facts should be drawn up, under the direction of the Chief Justice, to be incorporated in the record in the cause, in order that the defendants below might be enabled to prosecute their writ of error, if advised so to do.

In obedience to this rule, (as is said in the document annexed to the writ of error,) a statement of facts, which are set forth in that document, was made; to be annexed to, and form part of the record in this cause.

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

From this statement, it appears that the cause was first referred in January, 1822; that, in March, 1824, the referees made a report in favor of the plaintiff below for the sum of $14,913 46. That the defendants below were dissatisfied with this report; and made an application to the Supreme Court to set it aside; which application was made on a statement of the evidence before the referees, agreed upon by the attorneys for the respective parties, instead of being made on affidavits in the usual way.

*Cause referred.*

*Report.*

*Motion to set it aside.*

The application to set aside the first report having been heard, the Supreme Court, in August, 1824, made an order that the report should be set aside, so far as it allowed interest to the plaintiffs below, after the second day of January, 1819; and on the charges for salary. And further, that in pursuance of a stipulation of the parties, the cause should be again referred to the same referees; and that they should report the amount due to the plaintiff below for interest to the last mentioned date, in addition to the sum due for principal. In pursuance of this order, the referees, in October, 1824, reported that there was due to the plaintiff below, the sum of $4565 38, for principal, and $7653 46, for interest, making together, $12,218 84, for which sum, with costs, the judgment was entered in October term, 1824.

*Report modified.*

*Corrected report made; and judgment thereon, Oct. term, 1824.*

The document returned with the writ of error concludes with a certificate under the hand and seal of the Chief Justice, that the state of facts had been settled under his direction, and that he approved of the same.

*Ch. J.'s certificate.*

Now, from what I have stated, it appears that the error in this case, if error there be, is not in rendering the final judgment upon the record as it is returned with the writ of error; but in the directions given by the interlocutory order of the 20th of August, 1824.

*Error, if any, is in the interlocutory order.*

It seems to me, we ought to be very cautious how we decide that a writ of error will lie on such matter so brought up. If a writ of error will reach this interlocutory order

*Court should be cautious how they decide on matter so brought up*

Renss.   Glass
Factory
v.
Reid

and the affidavits or statement of facts on which it was founded, I do not see why we may not have a writ of error to bring up every rule for a new trial that is granted or refused, with the depositions on which the application for the rule may be founded.   This is not, in my opinion, like the case of *Yates* v. *The People*, (6 John. Rep. 337,) or of *Clason* v. *Shotwell*, (12 John. Rep. 31 ;) in both of which cases, the writ of error was brought on the final judgment of the Court.

But it is not necessary to decide whether it is properly before the court.

But I do not find myself under the necessity of deciding whether the document returned with the writ of error, which is called the case, is properly before us, or not.   The record of the judgment is undoubtedly presented to us in proper form ; and I am ready to decide that there is no error in that.   And my opinion is the same whether I refer to the case or not.

Judgment record is in proper form.

Colden, Senator, examines the case as if properly before the court.

With these views I shall examine the cause as if the facts stated in the case transmitted with the judgment roll were properly before us.

Courts have held interest to depend on general equitable principles, without attempting any general rule.

As often as the question of interest has been before a court, the judges seem to have considered it as depending on general equitable principles ; and, in most instances, to have decided each case in reference to its particular circumstances ; without attempting to give any rule which might be generally applicable.

Cases considered.

In the case of *Pease* v. *Barber*, (3 Caines' Rep. 266,) which was an action for money had and received, Ch. J. Kent says, " there may be cases in which a defendant ought to refund the principal money only ; and there may be other cases in which he ought, *ex equo et bono*, to refund the principal, with interest.   Each case will depend on the justice and equity arising out of its particular circumstances."

So far have questions of interest been considered matters of equity, and not of strict law, that, as in the anonymous case in Johnson, (1 John. R. 315,) they have been left for the jury to decide.   In this case the court say, " Jurors have, in many cases, a discretion to allow interest by way of damages, according to the circumstances of the case."

It was said, in the argument, that it was derogatory to our jurisprudence to admit that there are not established rules by which every question arising in the administration of justice may be decided ; that discretion is the law of despots, and that the rights of individuals must be precarious where it may be exercised. But human institutions must partake of the imperfections of human nature ; and it requires no great experience to learn how much it is beyond the capacity of man to prescribe laws which may be applied, without the exercise of any discretion in those who administer them, to all possible circumstances. Notwithstanding our statutes are so voluminous, are the work of so many ages, and have been so repeatedly revised, our multiplied books of commentaries and reports show how inadequate legislative enactments are to afford rules for all occasions ; and how much, after all, must be left to the wisdom and discretion of judges, and of jurors ; " and to that moral sense of right and wrong, which, like the senses of tasting and feeling in every man, makes a part of his nature."

The question of interest, often depending so much upon considerations of equity growing out of the facts belonging to each particular case, the counsel, on either side, have not found it difficult to refer to innumerable cases, which, with the help of great ingenuity, and the liberty of reasoning from analogy, they have made to appear well calculated to support their respective pretensions.

It must be recollected that the question in this case arises on money advanced, by the intestate, for the use of the plaintiffs in error. However analogous this may seem to money lent, or to money had and received, the cases are not the same in principle.

Where money is lent by one to another, it is a transaction between the parties personally ; and, as was said by Gross, J. in the case of *Calton* v. *Bragg*, (15 East, 223,) which was an action for money lent : " If there be no proof of a contract, it might be given against the intention of the parties at the time of the loan. If they did not then contract for interest, it shows that they did not mean to reserve it." But this reasoning will not apply, when money is advanced

---

ALBANY,
Dec. 1825

Ronss. Glass
Factory
v.
Reid.

How far the administration of justice is capable of being governed by positive rules.

The allowance of interest often depends on considerations of equity, and the facts of each case.

Question here arises on money advanced. Not the same in principle with money lent, or money had and received.

Difference from case of money lent.

VOL. V. 76

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

*Semb.* not to
have been ad-
judged that in-
terest is not
allowable on
money advan-
ced.

by one, for the use of another, under an implied contract, and where there was no special or express agreement be tween the parties.

I do not find that any one of the cases, cited from the English books, or from our own reports, is a case where interest has been denied for money advanced. Nevertheless it is certainly true, that the judges often use expressions which would apply to such a case; but my meaning is, that the question whether interest was, or was not to be allowed on money advanced for the use of another, on an implied authority, has, in no case where there has been a decision against the allowance of interest, been the matter presented, by the facts, for the decision of the court.

It would be a tedious and irksome task to refer to all the English cases which have been quoted, in order to show that not one of them is inconsistent with this assertion. I shall content myself with remarking, that the case of *Calton* v. *Bragg*, which was so much relied upon in the argument, was an action for money lent.

American
cases.

But I will, as briefly as I possibly can, notice the cases in our own books to which we have been referred.

The counsel for the plaintiffs in error cited the case of *Campbell* v. *Mesier*, (6 John. Ch. Rep. 21,) to show that there the Chancellor allowed interest for money advanced, from the time of demand and refusal only. The circum stances of that case were very peculiar. The defendant was liable to contribute to the rebuilding of a party wall. He not only refused to contribute, but forbid the prostration of the old wall. The complainant erected a new one, at a much greater expense than the re-establishment of the old one required. It could not be ascertained till the new wall was appraised, and it was estimated what it would have cost to restore the old wall, how much the defendant ought to have paid. When this appraisement and estimate were made, and the extent of the defendant's liability was thereby settled, the complainant demanded the amount. The Chancellor decided that the defendant should pay interest from that time. Here was a case very different from an advance of specific sums of money. It is true the demand is consid-

ered in the Court of Chancery, as a demand for money advanced; but it was more like a demand for unliquidated damages, which never carries interest. The defendant could not have discharged the principal till after the appraisement and estimate had settled how much he was liable to contribute to the party wall. But nevertheless the Chancellor in giving his opinion, in that case, says, "It is the settled rule in the law of this state that interest is to be paid for money received, or advanced for the use of another, after a default in payment." Let it be remarked that the Chancellor does not say, after *demand and refusal;* but after *default in payment.* It is true that the decree is for interest from the time of the demand and refusal. But it appears that this was all that was asked by the counsel. They contended, as appears by the report of the case, for no more than that interest ought to be allowed from the time of the advance of the money for the building of the wall in 1803, *and the demand, and refusal of payment.* But I do not think this case of *Campbell* v. *Mesier,* can be relied upon as establishing any general principle applicable to the case before us. The circumstances were very peculiar, and so different from those now under consideration, that I should not have noticed it so particularly, had not the counsel for the plaintiffs in error seemed to rely upon it as an authority much in their favor.

In the case of *Kanes* v. *Smith,* (12 John. 156,) the question as to interest turned upon the construction of a special agreement. The plaintiffs were to pay interest for so much as the wines shipped by the defendants might produce, more than sufficient to reimburse to them the value of the merchandise which they consigned to the defendants. But there was no stipulation for interest in case, as it happened, the sales of the wines should not be equal to the value of the cargoes furnished by the Kanes. In the first place, it is to be remarked, that here was no advance of money, made by the plaintiffs, in virtue of an implied authority from the defendants. And the court would not construe the agreement to mean that the defendants should be liable for interest for which there was no stipulation, if the result of the

ALBANY,
Dec. 1825.

Renss.  Glass
Factory
.v.
Reid

adventure should leave them a sum to make the plaintiffs good.

In *Porter* v. *Bussey*, (1 Mass. Rep. 436,) the Supreme Judicial Court of Massachusetts would only allow interest from the commencement of an action to recover a return premium.

In *Storer* v. *Storer*, (9 Mass. Rep. 37,) the same Court refused to allow an administrator interest on advances ; because, as the court said, he might have put himself in cash from the estate.

The case of *Winthrop* v. *Carleton*, (12 Mass. Rep. 4,) so far from showing that interest is not to be allowed on advances, is directly the reverse. The claim was for interest on money advanced by the plaintiff, as consignee of the defendant's ship. Parker, Ch. J. says, " The defendant must be considered as indebted to the plaintiff, in Charleston, *the moment the money was advanced ;* and he ought to pay the same interest which he would have paid, had he given his promissory note at the time." But, for some reason which is not apparent,(a) part of the interest to which the plaintiff was entitled, could not be allowed. For, the Chief Justice adds, " The plaintiff will lose the interest of his money, from the time of his advancing it to the commencement of the action, which perhaps he might have recovered, if it had been attended to in season."

In *Jacobs* v. *Adams*, (1 Dall. 50, 52,) the claim was for money paid to an executor, appointed by a will which was afterwards revoked. The court said, as the money was paid as well as received in mistake, and no fraud could be imputed to either party, interest was only payable from the time of demand.

---

(a) It seems, from the opinion of Ch. J. Parker, that the only question in relation to interest, in that case, was, whether South Carolina interest, at the rate of seven per cent, was to be allowed, or Massachusetts interest, which was only six. By the report of the case, which is rather obscure, it does not appear that the interest which accrued prior to the commencement of the suit, was claimed at the trial. If it was not, the court could not allow it under the stipulation by which the cause was brought before them. It is probably this fact to which the chief justice alludes, when he intimates that such interest might have been recovered, and at the South Carolina rate, if it had been attended to in season.

In *Williams* v. *Craig*, (1 Dall. 313,) the court set aside the report of referees, because they had allowed interest upon an unsettled account. But it does not appear by this report, that the account was for money advanced. On the contrary, by a reference in that case to *Henry* v. *Risk*, (1 Dall. 265,) as an authority, it would seem that the account in the former was for goods sold and delivered.

There were two other cases, one from 13 Massachusetts Reports, and another from 1 Connecticut Reports, cited by the counsel for the plaintiffs in error, to show that interest had been denied on cash advances, which I have not had an opportunity of examining. I have not taken much pains to procure them; because, whatever they might decide, they could not control what I consider to be the whole current of authority on the subject. And unless these cases are to the contrary, I think I may repeat, what I said in the outset, that no one case, cited by the counsel for the plaintiffs in error, decides that interest is not to be allowed on money advanced by one person for the use of another.

On the other hand, there are very many cases by which it has been decided that interest is to be allowed on such advances, from the time they are made. Of these cases I shall notice but two or three.

*Craven* v. *Tickell*, (1 Ves. jun. 60,) was a case of money expended by the complainant for the defendant, in building a house. Lord Chancellor Thurlow says, " Interest must be given on the money expended, since it was laid out. Money paid to the workmen who were to be paid by the defendant, is money advanced for him."

In *Lessee of Dilworth* v. *Sinderling*, (1 Bin. 494,) Ch. J. Tilghman says, " It may now be safely affirmed, that for a considerable time past, the settled law has been, that interest is recoverable for money lent and advanced." And interest was allowed from the time of the advances.

In *Liotard* v. *Graves*, (3 Caines' Rep. 238,) Thompson, J. says, " With respect to interest on the plaintiff's account, I think they had a right to charge it on the money advanced, but not on the account, as it was unsettled ; and, therefore, interest ought not to be calculated, *except on the money ad-*

*vanced.*"  In the same case, Livingston, J. says, " Interest ought to be allowed on all moneys advanced from their respective payments."   Ch. J. Kent says, " The account exhibited, is but a naked account current ; and interest is to be allowable only on such items in it as are for moneys advanced."

It is now a well established general rule that one is entitled to interest on money advanced, from the time of the advance.

However it may be, with respect to money lent, or as to money had and received, or in regard to merchandise sold and delivered ; or, however it may be where advances are made in pursuance of an express agreement, in which nothing is said about interest, I think the above authorities will admit of no other conclusion than that it is now a well established general rule of law, that where a person advances money for the use of another, under an implied authority, he who makes the advance is entitled to interest from the time it was made.

Advances in question were made on an implied authority ; and with the knowledge of the company.

That the advances were made, by the intestate, under an implied authority from the plaintiffs in error, it appears to me, is well established by the facts stated in the case.   It is stated, that when Reid assumed the agency of the factory, in 1813, it could not have been kept in operation without advances.   It would be extending an indulgence to incorporated companies to which I do not think they are entitled, to presume that the plaintiffs in error were so ignorant of their affairs as not to know that this was their condition. They afterwards found the factory proceeding.   They must therefore have known that there were advances, without which it could not have been put in operation, or carried on ; and that they must have known that these advances could only have been made by their agent, Reid.

Interest was allowed to Reid & Alsop ;

Again ; when the factory was conducted by Reid & Alsop, in partnership with the plaintiffs in error, there was an express stipulation that Reid & Alsop should make the necessary advances, upon which interest should be allowed.

whence Reid might presume it would be allowed to him.

When Reid, as to the management of the concern, took the place of Reid & Alsop, and found that advances were yet necessary, and that the company made no provision for them, I think he had a right to presume that it was intended by the company that he should make them ; and that they

were to be made on the same terms in which they had been made by him, and his partner, Alsop; that is to say, that interest was to be allowed. But independent of all these circumstances, I think the report of the referees is conclusive as to the advances having been made under the implied authority of the plaintiffs in error. There was no express agreement relative to advances; and unless the referees had found that the intestate had an implied authority from the company to advance, they could not have reported any thing to be due to the administratrix. It is not sufficient, that advances are made for my use, to make me liable therefor. I must have authorized them, either expressly or impliedly; or given them my sanction after they were made. If a person volunteers a payment on my account, without any authority, expressed or implied, I am not obliged to reimburse him.

It has been insisted that interest is not allowable on an open unliquidated running mutual account; and many authorities have been cited, which, I think, establish this as another general rule. But in the case of *Liotard* v. *Graves*, in which the claim for interest was on such an account, we see that the plaintiffs were allowed to select the items which were for money advanced; and to recover interest on these from the time of the advances; although it was disallowed on the general balance.

In the case before us, the account, on the one side, is wholly for cash advances made by the agent; and on the other, of cash received by him. It does not appear to me, that this is a mutual, running account, in the sense of those terms as they are used in any of the cases which have been cited. If the agent would have been entitled to interest if he had advanced only one sum, and so could have made only a single charge, and could not, therefore, have exhibited a running account, I cannot conceive why, when repeated advances would oblige him to make an account of many items, he should not have the same claim for interest on each advance, that he would have had if his whole advance had been made at one time.

ALBANY,
Dec. 1825.

Renss. Glass Factory
v.
Reid.

Report conclusive that advances were made on an implied authority.

Advances for another without his express or implied authority, will not bind him to pay.

Interest is not, in general, allowable on a mutual running account, open and unliquidated.

Accounts for money advanced is an exception.

The account in question is not a mutual running account, within the meaning of the cases.

ALBANY,
Dec. 1825.

Kenss. Glass
Factory
v.
Reid.

Rule that money advanced on implied authority carries interest, has its exceptions, founded on equitable considerations.

Colden Senator, for affirmance

I have said that it is a general rule that interest shall be allowed on money advanced on an implied authority ; but, like all other general rules, this may have its exceptions, growing out of circumstances connected with the transaction which may render the claim of interest inequitable. I find, however, no such circumstances in this case. On the contrary, it appears to me that it would be very unjust to allow the plaintiffs in error to have the benefit of the intestate's advances, without obliging them to make any compensation for those advances. I think that neither law, justice or policy would sanction such a decision.

I am in favor of affirming the judgment of the Supreme Court.

BOWMAN, EARLL, ELLSWORTH, HAIGHT, KEYES, LAKE, LEFFERTS, MALLORY, M'INTYRE, M'MICHAEL, OGDEN, REDFIELD and THORN, Senators, concurred in the result of these opinions.

Whether the merits are regularly on the record.

Courts may compel referees to report in detail, which is preferable to a hearing on affidavit.

SPENCER, Senator. A preliminary objection is made, that a writ of error does not lie upon the record in this cause, so as to bring up the case settled by the Chief Justice, and which has been substituted for the report of the referees. There certainly is great irregularity in the form in which the facts are presented. It was competent to the court below to compel a detailed report by the referees of all the testimony before them, which might have been amended on the motion of either party in the same manner as Justices' returns to writs of certiorari ; and the report thus perfected, being spread on the record, would present the case with all the precision and accuracy of a special verdict. When the beneficial operation of the statute authorizing references, is considered, and the multitude of causes which, under the modern liberal practice, are determined by that method, it is desirable that the present loose mode of presenting the merits by affidavits, often contradictory and always obscure, should be superseded by the more technical and regular reports of referees, which will at least abbreviate the proceedings and save labor in the examination of a case. Had not

the counsel for both parties acquiesced in the manner, in which the facts in this case should be settled and presented, I should, as one, refuse to consider them as any part of the record, upon the same principles that a case settled before a judge, in an ordinary trial at law, forms no part of the record of judgment, and is not brought up by a writ of error. But from the proceedings which have taken place in the court below, I consider both parties as having agreed that the case settled by the Chief Justice should be taken and received in place of the affidavits used in the Supreme Court. And then I apply to this case the remarks of Sanford, Senator, in *Clason* v. *Shotwell*, (12 John. Rep. 64,) in which I entirely concur, that " whatever may be the mode of proceeding adopted by the Supreme Court, whether formal and usual, or extraordinary and summary, (by which that court acquires jurisdiction,) it can make no determination of the cause which will not be subject to the constitutional revision of this court." " All causes determined in the Supreme Court, whatever may be the course or mode of proceeding by which they may be conducted or determined, are subject to the appellate jurisdiction of this court."

Considering it in that light, and as a part of the record, it is to be treated as a special verdict presenting facts and leaving questions of law for the determination of the court. This view removes the technical objections which were urged on the argument.

That it is a novelty, that a writ of error should be brought upon a judgment founded on the report of referees, furnishes no solid objection, when the same principles apply, and the same reasons exist for bringing it, which subject judgments upon special verdicts, and demurrers to evidence, to the same revisal. It strikes me as a monstrous proposition to say that the right of trial by jury may be taken away by statute, and then, because it is taken away, the judgment which may be rendered shall not be subject to the revision and appeal provided by the constitution. If that were indeed its effect, I should say that the law itself which provi ded such a mode of trial would be unconstitutional, and any

**Marginalia:**

ALBANY, Dec. 1825.

Renss Glass Factory v. Reid.

Counsel to be considered as having agreed that the case settled by the chief justice should be taken as part of the record; and therefore it may so be considered.

Error lies on a judgment in respect to a report of referees.

judgment rendered pursuant thereto, for that reason, erroneous.   If we were to yield to the counsel for the defendant in error the force of his objection, that because this action had been referred, and judgment rendered upon the report of referees, therefore there could be no writ of error, the conclusion in my mind would be, that for that very cause the judgment should be reversed ; for the same reasons that this court would reverse or revoke a judgment in an action of trespass where it appeared that the court below had refused a trial by jury.   References having been authorized

*References are constitutional.*

by the colonial laws, (2 Van Schaack's edition, 517,) they do not contravene the provisions of our constitution.   It is therefore a constitutional mode of trying certain questions.  This cause has been tried in that manner, the Supreme Court has confirmed the report of the referees, and rendered judgment thereon.   The only question presented is, whether that judgment be a final determination of the cause.

*In the most technical sense, the decision in question is a judgment of the supreme court.*

It was remarked in the argument, that the motion in the Supreme Court to set aside the report, was in the nature of a motion for a new trial.   This is true.   Of the same character would be a motion to set aside a special verdict, and for a new venire.   But the refusal in either case, would be a confirmation of the report or verdict ; and if followed by a judgment, would necessarily be final.   The court having confirmed the report would no longer entertain any motion or other proceeding in the same court to revise their judgment.   There can be no question then, I apprehend, that this is, to all intents and purposes, and in the most technical sense, a "judgment of the Supreme Court."

*Error lies on every final judgment of the supreme court.*

It seems hardly necessary to refer to any case, to decide whether a writ of error lies upon a final judgment ; for if not in such a case, it does not lie in any.   The case of *Clason* v. *Shotwell*, (12 John. Rep. 31,) turned, entirely, upon the question, whether the rule of the Supreme Court directing re-restitutions of the possession of property, which had been taken under a forcible entry and detainer, was or was not a final judgment.   It was conceded by counsel on both sides, is expressly admitted in the dissenting opinion of Chancellor Kent, and is the basis of that delivered by San-

ALBANY,
Dec. 1825.

Renss.　Glass
Factory
v.
Reid.

tord, Senator, that if the cause be terminated in the Supreme Court; if there be a definitive judgment, which gives or concludes the right of the party, a writ of error lies. The case of *Brooks v. Hunt*, (17 John. Rep. 484,) recognizes the same principles. The writ of error in that case was brought on the refusal of the Supreme Court to set aside an execution; and one of the reasons for quashing it, was, that the rule denying the motion was not a judgment; and this court then decided that the writ would lie only upon a final judgment or determination of a cause. That this cause has terminated in the Supreme Court, that there is a definitive judgment concluding the rights of the parties, cannot admit of a question. And as that is the only test to determine whether a writ of error lies, I am of opinion it is well brought in this case.

In approaching the merits of this cause, the magnitude, importance and difficulty of the questions which it involves, will excite distrust in any conclusions to which the mind may arrive. But having the solemn duty to perform, of making up an opinion satisfactory to myself, and having bestowed all the time, labor and attention which it required, I have come to a conclusion which I am bound to express. Yet when the difficulties of the subject are considered, there will be little occasion for surprise if differing views should be entertained.

*On the merits.*

An English reporter has remarked, that, "it would fortunately be a very difficult matter to fix upon another point of English law in which the authorities are so little in harmony with each other." (1 Campb. N. P. Rep. 53.) And yet there are few branches of the law of more immediate, direct and practical importance, not only in our extensive commercial transactions, but in the every day business of every man, in every station and condition of life. The cause of the contradiction of opinions and of the inconsistency of adjudged cases, on any subject, will be found always to be, the attempt to establish arbitrary rules without referring them to the reasons and principles on which they should be founded. Such has been the case with the law of interest. No elementary writer has ever attempted to

Authorities little in harmony with each other.

ALBANY,
Dec. 1825.

Renss.    Glass
Factory
v.
Reid,

analyze the multitude of cases, and exhibit the principles which govern them. And although some judges have, in isolated cases, given the reason of the rules they prescribed, yet have these reasons been as various and discordant as the cases themselves; and have produced confusion instead of system.

The reason of rules of law should be well understood; and the cases harmonize with them.

The experience of ages demonstrates that the law can never be rendered clear, intelligible and permanent, without the reasons for its rules are understood, its leading principles settled, and the cases which arise under it, founded upon those principles. In many of the branches of the law, we are indebted for the advances towards certainty which have been made, to the efforts of individuals to reduce the confused mass of cases into system, and extract from them the principles which can alone guide us in the decision of new questions as they arise. This cause presents such a question, and it appears to me that it cannot be satisfactorily determined without reference to the great principles of the law of interest, and to the reasons of the rules in analogous cases. The attempt, therefore, to reduce that branch of law into some kind of system, seems required by the necessity of the case, and however unsuccessful, still it may be useful in stimulating further exertions; and inducing others more competent, hereafter to accomplish it

Propositions to arrange the decisions upon interest under their governing principles respectively.

The cases to which we have been referred, and many others, have been examined, and an effort will be made to arrange them in appropriate classes, or divisions, in reference, solely, to the principles which it is supposed governed their decision. This will be done, to prove the principles themselves, to sustain and fortify them, and to show that these cases, with very few exceptions, do in truth proceed on a common reason, and may be brought into a harmonious system.

History of the law of interest.

It seems to be the better opinion, (Hawkins, book 1, chap. 82,) that by the ancient common law, it was absolutely unlawful to take any kind of interest or usury, as it was then called, for money. In an anonymous case in Hardus, (Hard. Rep. 420,) Lord Hale is reported to have said, that "Jewish usury was prohibited at common law, being £40 per cent. and more; but no other." But Hume, in his 33d chapter, says, "In 1546 a law was made for fixing the inter-

‚st of money at ten per cent. the first legal interest known in England. Formerly all loans of that nature were regarded as usurious. The preamble of this very law, treats the interest of money as illegal and criminal." Mr. Jefferson, in a letter to Mr. Hammond, which will be found in the 1st vol. of American State Papers, 307, (1st edition) says, that " In England all interest was against law, until the statute of 37 Henry, 8, chap. 9," which is the statute referred to by Hume. And he furnishes the strongest reasons for confidence in his correctness, by the statement of a fact, that interest is still considered unlawful in all Roman Catholic countries. Until the time referred to, that was the established religion in England. This has appeared to be a starting point of some importance, as it has a considerable bearing in construing the statutes on the subject.

The statute of Henry 8, referred to, simply provides that " none shall take, for the loan of any money or commodity, above the rate of ten pounds for one hundred pounds, for one whole year." All the statutes which have been passed in England and in this state, are in the same language. They are negative, prohibitory of interest being taken above a certain rate ; they are none of them affirmative ; they do not declare in what cases interest shall be taken ; much less do they in any case require it to be paid.

Since then, neither by common law nor by statute, is a party in any case required to pay interest. It follows inevitably and irresistibly, upon the universal principle of all law, that a man cannot be made legally liable to pay interest, as such, without his own agreement to that effect. All liability must be created by law, or by agreement. Some agreements are contrary to law. Such were contracts for the payment of interest, until the statute allowed them ; such contracts for a higher rate than is allowed by statute are still contrary to law. These deductions seem obvious and familiar ; but I apprehend they lie at the foundation of the questions in this cause. If correct, they establish a great principle in the law of interest, which will guide us through its labyrinths ; that its allowance by the courts, as an incident to the debt, and invariably following it, is founded sole-

ly upon the agreement of the parties. It is allowed also, in another class of cases, by juries, as a measure of damages under the advice of the court, but in their absolute discretion; which class must be carefully distinguished from that when it is allowed by the courts, as the judgment of law. The confusion and mingling of these classes has led to much of the difficulty which has arisen on this subject. They depend on principles entirely distinct, and do not furnish even an analogy to each other.

To sustain the above position, that whenever the courts allow interest as such, as incidental to the debt, and under rules precluding all discretion, they do so on the ground of the agreement of the parties, in addition to the reasoning founded upon the common law and the statutes, I refer to the case of *Calton* v. *Bragg*, (15 East's Rep. 226,) as full and conclusive authority. Lord Ellenborough says in that case, "Lord Mansfield sat here for upwards of thirty years, Lord Kenyon for above thirteen years, and I have now set here for more than nine years, (a period of 52 years) and during this long course of time, no case has occurred where, upon a mere simple contract of lending, without an agreement for the payment of the principal at a certain time, or for interest to run immediately, or under special circumstances, from whence a contract for interest was to be inferred, has interest been ever given." I quote this, not as an opinion, but as evidence of a fact; and coming from such authority, conclusive proof of the law of England, at the time mentioned. The researches of counsel confirm the evidence, if it needed any; and it is strengthened by the opinion of Mr. Jefferson, in the letter to Mr. Hammond before referred to, and quoted by the counsel for the plaintiffs in error. These remarks are to be understood as applicable only to the first class of cases, where the court allow interest, and not to that class where juries in their discretion give it as damages; for Lord Ellenborough, himself, frequently directed it in actions of trover and trespass for chattels, and in other actions of *tort*.

I consider it established then, beyond all question or cavil, that the allowance of interest, by the court, as an incident to the debt, is always founded on the agreement of the par

ties. It will be seen that most of the cases in England and in this country, recognize this great principle; and that it is the only one upon which they can be reconciled and harmonized. It is one of plain common sense, easily applied, and which rejects all the artificial reasoning which has been sometimes employed.

This agreement may be expressed in writing or by words, or it may be implied.

*First.* If there be an agreement in the body of a note or other instrument, that interest shall run with the debt, it is invariably assessed. If there be a verbal agreement to pay it, that is equally binding; for there is no law requiring such a contract to be in writing.

*Secondly.* That this agreement be implied;

*1st.* From the custom or usage of the business in which the debt is contracted. When such custom is known to the parties, or may reasonably be presumed to have been known, it enters into the original contract, and forms a part of it. (*Eddowes* v. *Hopkins*, 1 Dough. Rep. 375. *Selleck* v. *French*, 1 Con. Rep. N. S. 35.) But there ought to be evidence that such custom was known. (1 Starkie, 487.)

*2d.* Where the principal is to be paid at a specific time, the law has always implied an agreement to make good the loss arising from a default, by the payment of interest. (Per Lord Mansfield, in *Robinson* v. *Bland*, 2 Bur. 1806.) This proceeds entirely on the idea of a default, and it is a universal maxim that where interest does not run with the principal none accrues until a default is made in payment.

This is illustrated by the familiar case of a note payable on demand, when it is never allowed but from the time of demand made by suit or otherwise.(*a*) When a default of payment is made, then interest attaches. "All contracts to pay, undoubtedly give a right to interest from the time when the principal ought to be paid," is the remark of Lord Thurlow, in 2 Bro. C. C. 3. The same principle is admitted by Lord Ellenborough in *Calton* v. *Bragg*, before cited; and in *Mountford* v. *Willes*, (2 B. & P. 337.)

Interest is allowable on money lent from the time it was agreed to be paid. This was the decision in *Robinson* v.

*(a)* Vid. *Jacobs* v. *Adams*, (1 Dall. 52.) per M'Kean, C. J.

---

*Margin notes:*

ALBANY, Dec. 1825.

Renss. Glass Factory v. Reid.

which may be express or implied.

Express.

Implied.

1. From custom or usage in a particular business.

2. When principal is to be paid at a specified time; and there is a default as to payment.

A note payable on demand carries no interest till demand, by suit or otherwise.

Money lent.

ALBANY,     *Bland,* (2 Burr. Rep. 1085 ;) and this must be the mean-
Dec. 1825.   ing of the Judges in *Blaney* v. *Hendricks,* (W. Bl. 761,)
Renss.  Glass where they say, simply, that interest is allowable on money
Factory      lent.   The case of *Robinson* v. *Bland* was referred to, and
v.           would appear to be the authority for their decision.   And
Reid.        so Kent, Ch. J. in *Day* v. *Brett,* (6 John. 24,) says, "mo
ney received or advanced for another, carries interest *after
a default in payment.*"   But there cannot be a default un
less there was a specified time for payment, or there has
been a demand or something equivalent.

3. Account li-    *3d.*   Where an account has been liquidated by both
quidated.     parties, and the debt therefore becomes due and payable,
it carries interest on the same ground of a debt payable at
a specific time ; that there is an implied contract to pay.
This reason is given in *Boddam* v. *Ryley,* (2 Bro. C. C.
3.)   The rule is settled by other cases.   (2 W. Bl. 761, 3
Wils. 205, and 15 John. 424.)   It is also recognized by
those cases, which decide, that, upon an open account
where mutual credit exists, interest is not allowable unti
a liquidation ; (1 Dick. 428, 6 John. Rep. 45, 1 John. Rep.
315 ;) and by those cases where it is held that interest is
not allowable on unliquidated accounts.   (2 Salk. 623 ; 1
H. Bl. 303 ; 2 Bos. & Pul. 219 ; 2 Gall. Rep. 45 ; 1 P.
Wms. 376 ; 7 John. 213.)

Judgment.     Where a demand is liquidated by a judgment, the right
to recover interest in a new action, is founded on the same
principle.   (6 John. 283.)

4. Account    *4th.*   Where an account has been rendered, and the
rendered and  debtor, during a reasonable time for that purpose, makes
not objected to. objection, it may fairly be presumed that he has acqui-
esced in it.   It then becomes a liquidated account, and
carries interest, upon the same principle from the time of
such presumed liquidation.   (2 Vern. 276.   2 Ves. Sen. 239.
2 Atk. 252.   15 John. 424.)

On demand of   For the same reason, a demand of payment of an un-
unsettled     settled claim for wages, being equivalent to the render-
claim for wa- ing of an account, entitles to interest for such demand ;
ges.          as then the debt is liquidated, due and payable.   (2 Gall.
Rep. 45.)

And this I apprehend to be the principle which governed the decision of the Supreme Court, in the case of *Kane* v. *Smith*, (12 John. 156.) The defendants were charged with interest from the time the deficiency in the funds provided by them was ascertained, and they were notified of the balance; for until then, the court say, the defendants could not be deemed in default. So, the case of *Brown* v. *Campbell*, (1 Serg. & Rawle, 179,) upon notice that the plaintiff's money was applied to his use, the defendant was in default, in withholding payment.

*5th.* Upon the same principle, there may be various other circumstances in the transactions between the parties, which furnish evidence of an intention by the debtor to pay interest. The giving a note or bill of exchange, which is void or turns out to have been of no value at the time, or the offering to give a written security for the debt, has justly been considered evidence that the debtor considered the debt to be due and payable, and carrying interest on the same ground as where it was payable at a specific time. Such an instance is furnished by the case of *Robinson* v. *Bland*, (2 Bur. 1088.)

The rendering an account, containing a charge of interest on particular items, and that account being liquidated by the debtor, is evidence of an agreement to pay the interest thus charged; and is so held by Lord Ellenborough in the case of *Calton* v. *Bragg*, before cited.

So, such an account being acquiesced in by the debtor's omitting to object to it within a reasonable time, furnishes the same evidence of an agreement to pay the interest charged, as was held by Livingston, J. in *Liotard* v. *Graves*, (3 Caines's Rep. 226.)

And in subsequent dealings between the same parties, of the like nature, the liquidation of such a former account, there being no new agreement and no new circumstances to vary the case, would furnish sufficient ground to imply an agreement to pay the like interest in those subsequent dealings. Such was the case of *Nichol* v. *Thompson*, (1 Campb. N. P. Rep. 52.)

Vol. V.                    78

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

Default after
notice of balance.

Giving a void
note or bill, or
offering security.

An account
charging interest on particular items,
liquidated by
the debtor;

or not objected
to in a reasonable time;

and in subsequent dealings
of the same
nature, between same
parties;

And on the same principle, where interest has, under like circumstances, been allowed by the debtor to other creditors, the knowledge of which comes to the creditor in the given case, and he acts in expectation of a similar allowance, there would be good ground to presume an agreement, to

*or between the same debtor and another creditor who knows of the former allowance; and therefore expects it in his own case.*

pay interest also to the new creditor. This would be in analogy to the rule which exists where there is a custom or usage of trade. I find no adjudged case which precisely determines such a rule, although there are many analogous. It is certainly as broad and liberal as the most strenuous advocates for the allowance of interest could require, and is more nearly applicable to the present case than any other.

It is believed that these classes comprehend all the cases of implied agreements that have been cited, excepting those of *Liotard* v. *Graves*, (3 Caines' Rep. 226,) and *Dilworth*

*In most cases the implied agreement must be found by jury.*

v. *Sinderling*, (1 Bin. Rep. 494.) In most of them, the question whether there was an agreement to allow interest, is one of fact, which should be left to a jury; and that fact once ascertained, the rule of law applies. A great share of the difficulty on this subject, has arisen from the court's undertaking to draw a rule from the facts of each case, by which it is made fluctuating and uncertain.

*In the above classes interest is necessarily incidental to the debt.*

In these classes which have been enumerated, the interest is considered a necessary incident to the debt, following it, as is said in one of the cases, like a shadow following its body.

*Another class is where a jury may allow it in their discretion.*

But there is another class of cases, already alluded to, in which interest may be allowed by a jury, under the advice of the court, in their discretion, and which, when fairly exercised, the courts will not disturb.

*and where it is not a necessary incident to the principal claimed.*

This second class comprehends those cases only where interest is not a necessary incident to the debt, but may be allowed under circumstances, by way of mulct, or punishment, for some fraud, delinquency, or injustice of the debtor, or for some injury done by him to the creditor; and in such cases the legal rate of interest is assumed as the measure of damages. This is done,

*1. In actions ex delicto;*

1st. In action of *tort* technically so called; as in trover, or in trespass for taking chattels. (8 John. 446. 14 John. 128, 273, 385.)

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

The application of the rule in these cases may sometimes be capricious; but the rule itself is as certain as any other which allows damages in any case. The judgment of twelve indifferent men, is the best criterion that can be establish ed.

2d. In actions upon contracts. Thus, Radcliff, J. in his opinion, which was sustained by this court, in the case of *Lynch* v. *De Viar*, (3 John. Cas. 310,) says, "It is a settled rule that money received to the use of another and improperly retained, always carries interest." In that case, the party had expressly promised to pay the money when received; and withheld it under frivolous and unjust pretexts The contrary doctrine which was laid down in *De Bernales* v. *Fuller*, (2 Camp. N. P. Rep. 426,) must have arisen from not sufficiently distinguishing between the cases where a jury *may* allow interest; and those in which the court *must* allow it. It seems to have been confounded with the latter class. It is contradicted by the decision of this court already referred to; by the Supreme Court of this state in *The People* v. *Gasherie*, (9 John. 71,) and *Slingerland* v. *Swart*, (13 John. 255;) by the Supreme Court of Massachusetts, in *Wood* v. *Robbins*, (11 Mass. Rep. 504,) and *Wyman* v. *Hubbard*, (13 Mass. Rep. 232;) by the Supreme Court of Pennsylvania, in *Crawford* v. *Willing*, (1 Dall. 349, 4 Dall. 289,) *Commonwealth* v. *Crevor*, (3 Binney, 123,) and *Brown* v. *Campbell*, (1 Serg. & Rawle, 179.) All these cases allow interest where there has been fraud, injustice or delinquency; and none of them put the allowance of it, on the ground of gain or benefit to the debtor from the use of the money alone. The case of *De Bernales* v. *Fuller* is opposed also to the most respectable English authorities. Lord Mansfield, (1 Doug. 375,) says, "In cases of long delay under vexatious and oppressive circumstances, interest may be recovered, if a jury, in their discretion, think fit to allow it." This remark is the more valuable, as showing the correctness of the distinction between the allowance of interest by the court and by the jury.

In the case of *Trelawney* v. *Thomas*, (1 H. Bl. 304,) cited and much commented on in the argument, the defendant had *engaged* the plaintiff to advance money in order to carry on an election, which he had done according to the re-

2. *Ex contractu.*

Money had and received.

Money advanced.

quest ; and in an action brought to recover the money thus expended, the jury allowed the plaintiff interest, which the court confirmed.  This case is to be referred either to the second head of implied agreements, that money received or advanced for another carries interest *after a default in payment,* upon the ground that being advanced on request, it was payable immediately, and the default arose on the first neglect, which would be sufficient to sustain the decision ; or it may be considered as proving such delinquency and injustice in the debtor, as to furnish sufficient ground for a jury to punish him by giving interest as damages.  There may in many cases be such a complication of circumstances, as would justify the allowance of interest on more than one ground ; and such is this case of *Trelawney & Thomas.*

Probably the rule of easiest application, would be this : where money has been lent, advanced or expended by request, and under an agreement to pay at a specific time, or where it has been had and received under a like agreement, then the allowance of interest may be safely referred to the principle of an implied contract to pay interest on default ; and so, also, where the money is not to be refunded at a particular time, but a default arises from a demand, or notice, the same principle will apply.  But where no time of payment is fixed, and where the duty to pay arises from the relative situation of the parties, it seems that it should be referred to a jury to determine whether damages shall be given, by an allowance of interest.  Thus, sheriffs and other public officers are required to pay interest on monies received by them, which it was their duty to pay over immediately. (*People* v. *Gasherie,* 9 John. 71.  14 John. 255.  7 Mass. Rep. 14.)  So a private agent, not applying money as directed, is chargeable with interest. (4 Dessausure, 110.)  But we also find it settled, in *Williams* v. *Storrs,* (6 John. Ch. Rep. 353,) that where an agent is ready to pay over money received by him to the party entitled to it, he is not in default and shall not be chargeable with interest, unless he has employed the money for the purposes of gain.  These are equitable considerations that must be left to a jury, and which a court ought not attempt to estimate.  All that a court

should do, is to instruct a jury, that if there be fraud, injustice, delinquency or default, they may allow interest. This doctrine is recognized by the Supreme Court in an anonymous case, (1 John. Rep. 315.)

ALBANY,
Dec. 1825

Renss. Glass
Factory
v.
Reid.

With respect to the allowance of interest to an agent for monies advanced by him, there is nothing in his character of agent to entitle him to it. He must receive it upon the same principles which would give it to any other creditor. Indeed, the general policy of the law is adverse to the allowance of interest to an agent or trustee for advances; it is presumed, for the purpose of withholding any temptation to speculate on the funds of his principal. (1 P. Wms. 376. 14 Vin. Ab. 458, pl. 10. Select Cases in Ch. 50. 2 Eq. Cas. Abr. 531. pl. 15.) So in the case of an administrator, the Supreme Court of Massachusetts refused interest on advances. (9 Mass. Rep. 37.)

Moneys advanced by an agent;

But where an agent has expended money by the directions of his principal, there can be no reason for distinguishing it from the case of money lent or advanced by any other person. An instance of its allowance in such a case is found in *Craven v. Tickell*, (1 Ves. Jun. 63,) which refers to the distinction between allowing interest on the contract, or by way of damages.

by direction;

So, if advances are made by an agent with the knowledge and acquiescence of the principal, it is but advancing a single step in the same train of reasoning, to presume a request. And if a request, an implied agreement to pay; and on a default in payment, the like agreement, as in all other cases of default, to pay interest.

or with the acquiescence of the principal;

So, in advance of a single sum, on a particular occasion, or a few sums, may, from the circumstances, furnish ground for presuming knowledge in the principal, acquiescence by him, and an implied promise to pay immediately, which as we have seen, carries interest from the time of default.

in a single sum;

All these are cases of advances on the one side, and depend upon the same principles which would regulate the allowance of interest to any creditor not an agent.

on one side;

The same principles will be found applicable to the case of *mutual credits*, between an agent and his principal.

or where there are mutual credits.

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

There must be a knowledge by the principal that the advances are making for him, and an acquiescence, to supply the want of a request. There must be a default on his part before he can be charged with interest ; for the citation of cases already made must have been to very little purpose, if they have not established the universal maxim that there can be no interest without default, where, by the contract, it does not run with the principal. But to cause a default, there must be *knowledge of a debt*.

*Advances on one side imply knowledge ; not so of mutual credits.*

In the case of single advances, or where they are made only on one side, that knowledge is implied necessarily from the fact of knowing that such advances are made. In the case of mutual credits, that inference does not follow ; for the credits may be equal to, or overbalance the advances. Hence it seems to be an irresistible consequence, that in the case of mutual credits, there can not be a default without the knowledge of a balance to be paid. The same principles which govern the laws of interest in all the other cases stated, ought to control here. If it is to be charged on the ground of an implied agreement, then there should certainly be a request to advance the money, or something tantamount, as knowledge and acquiescence, and a default upon which the implied agreement to pay interest arises. If it is to be charged upon the ground of delinquency in not paying, there must be knowledge of the fact on which the delinquency arises, before it can exist. That fact is the existence of a balance. These deductions seem to flow plainly from the principles which have been extracted from all the cases ; and which an effort has been made to arrange. And they are consonant to the first dictates of common sense and common justice ; that no man should be held liable to pay interest for monies advanced not only without his request or consent, but without his knowledge ; that he should not pay it where there was no default on his part, and where there could be none.

*Distinction illustrated from the statute of limitations.*

The distinction between the case of an account containing items only on one side, and that where there are mutual dealings and mutual credits, is exemplified by the different rule which is applied to those cases under the statute of lim

itations.    It was decided by this court in *Murray* v. *Coster*, (20 John. 603,) that the exception of merchants accounts in that statute, from its operation, applied not to the first case, of items on the one side only, but did apply to the second case of mutual credits: that is, that an action for the balance of an account founded on mutual credits, was not barred by the statute.    Upon what other principle can this distinction possibly proceed, but this : that in the first case, the debt was due and payable from the time it was incurred, or might have been demanded ; and in the second case, that of mutual credits, a liquidation by the parties or by suit was necessary?    This distinction under the statute, is applicable as well as to an account for money advanced as to one for work and labor; it is applied without reference to the character of the items, and depends simply on the fact whether there were *mutual credits or not.    It appears to me that the symmetry of the law* would be marred by amalgamating and confounding cases in the law of interest, which are distinct in the law of prescription ; and that to preserve the harmony of the system and the mutual dependence of the different parts, we should hold that a debt which is not considered due and payable by the law of limitation, shall also not be considered due and payable, under the law of interest.    And we shall thus pursue and preserve the policy which punishes neglect in demanding payment, by refusing an action after a certain period, and shall stimulate and reward vigilance, by giving interest where it is earned by promptness in liquidating accounts ; and we shall thus prevent the unwary debtor from becoming the victim of either the intentional or the negligent delay of his creditor.

These principles are believed to be in accordance with the opinions expressed by the Judges of the Supreme Court in this cause, or to be ligitimate conclusions from them, and from the numerous cases on the subject.  But there is one ground for the allowance of interest, intimated by one of the Judges, to which, as I understand it, I cannot subscribe. It is, that a " universal obligation rests upon every man to render a just equivalent for the use of that which does not belong to him."    This is unquestionably true, if that bene-

ficial use has been at l is instance. But my researches have not enabled me to liscover a case, and certain I am that none has been cited, that a man is bound to pay for the use of money or other property which has been applied to his benefit without his consent. The case of *Bartholomew* v. *Jackson*, (20 John. 28,) is one, like perhaps hundreds which may be found in the books, establishing a contrary doctrine. In that case it was held, that labor voluntarily performed by the plaintiff for the defendant, without his privity or request, however meritorious and beneficial it may be to the defendant, as in saving his property from destruction by fire, affords no ground of action. A claim for compensation or damages, in the shape of interest, for money applied to the benefit of another, without his privity or request, must rest on the same foundation with any other service. The benefit received is not the test. It must be requested or agreed to be received. Every man is permitted to regulate his own affairs in his own way; and he is the best judge when and where he will have services performed or money advanced for him. There is no equity in making him pay for the use of money, although employed for his benefit, without his request.

The principles
of the case ci-
ted, applied to
the    principal
case.

I proceed to apply the principles thus deduced, to the present case.

*First.* It is not pretended that there has been an *express* agreement by the plaintiffs in error to pay interest on the moneys advanced by Reid. *Secondly.* Is there any evidence of an implied agreement to that effect?

1st. There is no usage or custom known to the parties, set up. 2d. There was no specific time of payment agreed on. 3d. The account has never been liquidated. 4th. No account was ever rendered by Reid. Ch. J. Savage, in the opinion delivered by him in the Supreme Court, says, "There certainly appears to have been a culpable negligence on both sides;" in Reid, in not rendering his account, and in the plaintiffs in error, in not requiring them. Upon the principles which have been stated, as Reid or his representative holds the affirmative, and is bound to show the circumstance or fact which evinces an agreement to pay in

terest, the admission of a culpable negligence on his part, in omitting to do that which would apprise the adverse party of the state of affairs and which would furnish him a claim to interest, is, in itself, a strong circumstance against him. The plaintiffs in error then were, and still are on the defensive. Generally speaking, it is not the business of one who does not know the state of the accounts, and who turns out to be the debtor, to inquire into them; on the contrary, it is the duty of the creditor to apprise his ignorant debtor of the existence of the claim. And most clearly, I apprehend, is this the law with respect to agents. In the case of *Lady Ormond* v. *Hutchinson,* (13 Ves. 53,) Lord Eldon says, with respect to the steward of an estate, that " it is not necessary to call for an account from him. His duty requires him to render accounts periodically, and if from negligence or any other cause he fails in that, he cannot make the obscurity occasioned by that omission, a cover to him." The similarity of the case of a steward and that of an agent for a manufacturing company, is evident; and the difference, if any, is in favor of holding the latter to a more strict accountability. It appears to me upon general principles of policy that no agent ought to be permitted to found a claim of any kind, either for interest or salary, upon his own *culpable negligence.*

Conceding, then, that the plaintiffs in error were equally culpable, in their neglect to require an account, but which is not admitted, the precise case is presented where the maxim applies, contained in Jenkins : " Where neither party has any right, the condition of the possessor is the best." The case of *Beaumont* v. *Boultbee,* (11 Ves. 359,) decides, that where there had been such a mutual acquiescence and negligence on both sides, very similar to the present case, the agent should not be allowed interest until after the bill filed. The cases of *White* v. *Lincoln,* (8 Ves. 363,) and *Pearse* v. *Green,* (1 Jac. & Walk. 135,) cited on the argument on the part of the plaintiffs in error, together with various others in the equity reports, show the vigilance of the Chancery courts in preventing an agent from deriving any

---

*Margin notes:*

ALBANY,
Dec. 1825.

Renss. Glass Factory v. Reid.

Generally speaking, it is the business of the creditor to apprize the debtor of the state of the accounts between them, especially where the creditor is an agent.

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

advantage from his own *laches;* and establish the broad doctrine that where he has been guilty of it in rendering his accounts or any other neglect, he shall not recover interest, and in many cases he is deprived of his commission. All business men will probably subscribe to the justice and policy of this rule. I am not aware of its having ever been questioned; and unless there be some other grounds in the case, to sustain the claim of the defendant in error, the culpable negligence of Reid in this respect, furnishes in itself a complete bar to the recovery of any interest. I cannot consider his negligence in any way excused or mitigated by that of his principals, nor is the rule referred to, affected by any such circumstance. Under this head, therefore, no ground to claim interest is afforded by the rendition of an account; and on the contrary, the ommission to render it for more than six years, ought to be a bar.

Whether an
intention to al-
low interest is
inferrable from
the transac-
tions of the
parties.
Under the fifth head, as I have arranged it, of implied agreements to allow interest, we are to inquire whether there are any facts or circumstances in the transactions between the parties, either in the same or in any former business of the like nature, where interest has been allowed, or an intention to allow it has been evinced? It is not pretended, nor would the case warrant it, that there are any such circumstances in the transactions between the parties themselves, as evince an agreement to allow interest. But it is suggested in the opinion of the Chief Justice, that the defendants having agreed to pay interest on the advances made by Reid & Alsop, the year preceding, furnishes some ground for charging the plaintiffs in error with it in this case. It is due to the Chief Justice to observe, that this does not appear to be much relied on by him; but as it was thrown out by him, and has been urged with much force by the counsel for the defendant in error, it ought to be briefly examined. In the first place, it was not a transaction between these parties; and the fact, that the company had made a particular agreement with one agent to allow interest, and had subsequently made another agreement with another agent, in which nothing was said about interest, would furnish at least as strong reason for saying that the one did not mean to pay it.

as that the agent meant to receive it.   But, secondly, it was

ALBANY,
Dec. 1825.

not a business of the like nature.   Reid & Alsop entered in-
to partnership with the company, and were to advance the

Renss.   Glass
Factory
v.
Reid.

necessary funds ; and the stipulation always made in such
case, was made in this ; that the partner advancing capital
was to be allowed interest thereon, before a division of pro-
fits should be made.   But on the termination of this contract,
Reid was appointed agent, and is allowed a salary as such,
and never was a partner : and in his new capacity his con-
nexion with the  company was of a character entirely dif-
ferent and involving new rights and duties wholly distinct
from the former.    Indeed the argument is very strong
against its being considered the intention of the parties that
Reid should make advances, from the very fact that when
these new arrangements were making, no stipulation to that
effect was entered into, although it had been so carefully
provided for in the agreement with Alsop and Reid.

I conclude, then, that there is nothing in the agreement
with Reid & Alsop, which can show the nature and terms
of the subsequent agreement with Reid alone ; and I con-
sider that there is nothing in this case to establish an ex-
press or implied agreement to pay interest, which would
oblige the Court to allow it, as a rule of law.

Is it, then, a case included under the second general head,
where a jury might, in their discretion, allow interest ?   It

Whether a
jury might al-
low interest in
the    principal
case.

certainly is not one of those actions for wrongs, where such
a discretion exists.   Does it come under the second subdi-
vision of this head ?   And is it a case where, upon natural
principles of equity, the debtor ought to pay interest in con-
sequence of any fraud, delinquency or injustice ?'   The dif-
ficulty of arriving at precise and definite rules to govern this
class of cases, has already been mentioned, and the causes
of it explained.   But I think I have shown that the general
rule being that an agent is not to be allowed interest, unless
there be evidence of an agreement to pay it, or a delinquen-
cy, the burthen is on the agent claiming it, to establish the
agreement or the delinquency ; and that he must at least
prove a knowledge on the part of his principal, that advan-
ces were making, and an acquiescence in their being made,

before he can claim, upon equitable principles, any interest on those advances.    Indeed I understand this principle to be tacitly admitted by the Chief Justice, and he seems to endeavor to bring the case within it by these remarks : " On the whole, I am of opinion that from the manner in which the business had been done the year next previous to the appointment of Reid as agent ; from this being done with a full knowledge, on both sides, that large advances were necessary, if the defendants did not mean to pay interest, they ought so to have informed Reid, that he might not be using a large capital in their service when it was to be wholly unproductive to him." It will be perceived, that admitting the whole of this statement, it does not come up to the point of establishing a knowledge on the part of the company, or the directors, that Reid was actually making advances for them.    There could be no default on their part without a knowledge of their being indebted to Reid ; and that they could not possess, until the fact that he was making advances was brought home to them.    The remark of Ch. J. Tilghman, in *Brown* v. *Campbell*, (1 Serg. & Rawle, 179,) contains not only the law on this subject, but the reason and principle of it, such as I have been endeavoring to show, " that until the defendant was informed that the plaintiff's money was applied to his use, he was in no default, and therefore ought not to pay interest : but being informed, he became a wrong doer in withholding payment, and therefore should pay interest." Let it be observed, this is not a claim for the principal, but for the interest of the advances ; and it proceeds entirely on the ground of a default in the debtor ; for, as has been before remarked, it is a universal maxim, that there never can be interest where there is no agreement that it shall run with the principal, without a default.    The knowledge that advances were necessary at the time Reid & Alsop took charge of the concern, is no evidence whatever of the same knowledge existing when Reid was appointed.    But admitting, for the sake of the argument, that it did exist at that time, it was accompanied by a knowledge that he would be in the receipt of heavy sums from the establishment, from which he could refund him-

self; and it therefore did not amount to knowledge or notice that there was a balance of those advances against the company, without which there could be no default. This is the peculiarity attending the case of mutual credits, as has been before explained; that a knowledge of advances being made does not imply a knowledge that a balance was accumulating against them. It is different from the case where the advances are all on one side. There the mere fact of knowledge of such advances and acquiescence in them, might be sufficient to imply an agreement to pay at once; and there being a default, entitle to interest; but the same principle requires us, in the case of mutual credits, to go a step further, and demand proof of knowledge of an accumulating balance, and an acquiescence in that; for, until there be such an accumulation, there is no debt. The knowledge of a debt must precede the idea of a default in not paying it. This view is further confirmed by the subsequent remark of the Ch. Justice, that the company ought to have given Reid notice, " that he might not be using a large capital in their service." But how could they give the notice if they did not know the fact? For Reid could not be using his capital unless his advances exceeded his receipts; and they of course could not know it, until he informed them such was the fact; that is, that a balance was accumulating against them. It is with great deference, but with considerable confidence, that I consider the remark of the Chief Justice as not applicable to the case of mutual credits, although sound and correct when applied to cash advances, altogether on one side.

The facts in this very case, illustrate the principle. By the schedule A. referred to in the case and printed with it, it will be seen that the balance fluctuated, and that of those stated by the referees, ten were in favor of Reid, and thirty in favor of the company. It is reasonable, in such a state of things, to require of the company knowledge, or even reason, to presume that there was an ultimate balance against them?

Again, by the resolution of June 15th, 1813, the agent was directed to furnish an estimate of the funds necessary for

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

In the principal case, the balance fluctuated.

Resolution of June 15th 1813.

carrying on the works for the ensuing year; but this direc-tion appears never to have been complied with. If advan-ces were necessary, was it not emphatically the duty of the agent, after this special injunction, to inform the company? And shall he be permitted, in neglect of that duty, to pro-ceed without their knowledge, to make those advances, and then claim compensation by way of interest? It is wholly immaterial whether the company derived benefit from those advances or not. They had a right to know what amount of funds would be necessary, and to provide their own means of raising them. By this culpable negligence of their agent, they are deprived of the opportunity of do-ing so, and are made to borrow money of him to an inde-finite amount, without their privity or request, and are then called upon to pay interest, not only for the time the money was used in their service, but for as long a period afterwards as the agent chooses to conceal from them a knowledge of the fact of their being his debtors. I can never subscribe to such consequences. And if this case is to be determined upon equitable considerations, this one fact shows conclusively to my mind, that all equity and natural justice are against the defendant in error.

How can it be said that the company should have given Reid notice that they did not mean to pay interest on the balance of his advances, when they were kept ignorant by him of the fact of his making them; and when, from the nature of the business, they could not know that there was or would be such a balance? And is it correct, in any case, to require a party to give notice that he will not be accountable? It is not incumbent on the plaintiff to show a liability, affirmatively, and can he be permitted to say that it exists, because a defendant has said and done nothing about it, either to create or acknowledge it, or to deny it?

Thus far, this case has been considered strictly in refer-ence to those general principles of the law of interest, which have been stated in the former part of these remarks. It is believed that every case which has been cited, is compre-hended in that arrangement, and classed in one or other of the divisions, excepting only two, which have been much re-

lied upon in the argument. Perhaps the very fact that these two cases, as they seem to be understood, cannot be classed with any others in the books, and that they are contrary to the analogy to the law of interest, in all the other cases, furnishes some proof that they are themselves anomalous and erratic. But as one of the judges appears to place his opinion chiefly on the ground of their authority, it becomes a duty to examine them carefully, and as briefly as possible.

The cases alluded to, are those of *Liotard* v. *Graves*, in the Supreme Court of this state, and *The lessees of Dilworth* v. *Sinderling*, in Pennsylvania. They are supposed to decide, that interest is allowable on cash advances, whether on one side only, or in the case of mutual credits, without the account being liquidated, and without any other evidence or circumstance, to infer an agreement for the payment of interest. It will strike every one that such a rule founded on, and resulting from a particular case, instead of being deduced from general principles, must necessarily be arbitrary, fluctuating and capricious. To whatever extent the Supreme Court may have felt itself bound by a prior decision of the same court, it is proper to observe, that, in this court, that decision is no authority. We are as much bound to revise it, as the one brought up by this writ of error. The decisions in both cases, are upon the same footing, and entitled to regard, not for the names and stations are of the judges, but for the principles and reasons on which they are founded, and which they contain. With respect to that of *Liotard* v. *Graves*, truth compels me to say, that there are no principles to be extracted from it. Livingston, J. allows the claim of interest, expressly on the ground, that, " an account was rendered as early as 1797, which interest is calculated, and yet no objection to it was made, in the succeeding correspondence, from which, I conclude, such charge consisted with the understanding of the parties." This is sound and intelligible. The principle of an implied agreement is recognized, and properly applied. Had this been the only opinion delivered, there would have been no difficulty. But those of the other judges state the rule of law absolutely to be, that interest is legally demand-

ALBANY,
Lec. 1825.

Renss. Glass
Factory
v.
Reid.

*Liotard* v
*Graves,* 3
Caines, 226,
& *Dilworth* v
*Sinderling,* 1
Serg. &
Rawle's Rep.
179, examined.

Renss.  Glass
Factory
v.
Reid.

able on money advanced.   They furnish no reasons ; they advert to no principle ; but content themselves with the simple declaration of the rule.   Now the cases which have been aduced at the bar, and in the opinions of the judges, must have satisfied every one, that in 1805, when that cause was decided, there was no such settled rule ; that up to the period of our revolution, the rule was directly the contrary ; and that the whole current of authority, and the conclusive testimony of Lord Ellenborough before quoted, establish as firmly as any rule of law can possibly be established by decisions, that interest is not allowable  in such a case.   In the quotations which we have heard from the Pennsylvania reports, it is distinctly admitted, that the law was so settled but that a change had taken place in it. . By what authority ?   No legislative sanction is pretended.   As one, I am not prepared to admit or yield to judicial legislation, in a question so extensively affecting not only the commercial part of community but every other.

To what extent the common law is flexible.

I admire that principle of flexibility in the common law, which enables it to be adapted to the ever-varying condition of human society ; and it is in that respect unquestionably, altogether superior to any written code.  But I understand that flexibility to consist, not in the change of great and essential principles, but in the application of old principles, to new cases, and in the modification of the rules flowing from them, to such cases as they arise : so as to presume the reason of the rules, and the  spirit of the law.

*Liotard* v.
*Graves.*

Such, however, does not appear to be the case with the decision in *Liotard* v. *Graves*, if it be correctly understood by the Judges of the Supreme Court ; for unless it is put upon the ground assumed by Livingston, J. it departs from the spirit of the law of interest, and from the reason of all its rules in other cases.   Admitting it, then, to be as supposed, it is not entitled to be regarded as evidence of the law.

But the *dicta* of the other three judges, (for really. they can be called nothing else, in that case,) do not come up to the present.   They say interest is to be allowed on money advanced ; but whether in a case where the advances are all on one side, or in a case of mutual credits, they do n t

say; nor do they say whether a request to make those advances, or something tantamount, shall or shall not be required to entitle to interest. It will be perceived at once, that these are the two hinges on which this case turns; and the decision in *Liotard* v. *Graves*, is therefore really not applicable to it.

If, in considering that case, we are to be governed by the usual rules of construction, and confine the remarks of the judges to the case before them, the fair import of their decision will be found to be, that in a case where the advances are all one side, and are made at the request of the principal, interest is allowable. The claim to interest, in that case, was upon the charges for advances to Weeks, the captain of the vessel, and for other disbursements in London, while prosecuting the claim and appeal there. These advances were made by the express order of the defendant; and I cannot discover in the case the least evidence that the plaintiffs had received moneys belonging to Graves. In such a state of things, the decision in that case would be perfectly correct, and in conformity to the principles I have endeavoured to establish; but is, obviously, wholly inapplicable to the present case, where moneys were received and paid out, and mutual credits existed; and where there is no evidence of a request or even knowledge of advances being made. From the cases cited, subsequently decided by the same judges, it would seem to me, that they did not intend to establish a general rule, by the decision in that case, but were governed by its peculiar circumstances. With regard to this case then, I consider, firstly, that it does not establish the rule contended for, and is inapplicable to this case; and secondly, that if it did, it would be contrary to the whole current of authority, in England, and in this country, at the time of our revolution and long after, and unsupported by the principles of analogous cases, and ought not be regarded as authority in changing the law.

The other case relied on as an authority to sustain the judgment of the Supreme Court, is that of *Dilworth's lessees* v. *Sinderling*, (1 Bin. Rep. 448.) That was, indeed a most extraordinary case, in all its features. It was an action of

*ejectment*, brought by the *cestuis que trust*, claiming an *equitable* interest, against the executor and devisee, having the *legal* interest ; to us, and according to our ideas of law, a perfect monster.   But the recovery of the possession of land was to be subject to certain deductions, for advances made in a long series of years, and which were indispensable, for the repair of the premises.   Upon whom these deductions were to be apportioned, and how collected by a defendant in an action of ejectment, we are uninformed. But so it was, and the court was called upon to say whether interest should be allowed on those advances.   It is to be observed that the persons interested in the estate were infants, and incapable of making any request for advances ; but these being indispensable for the preservation of the property, and there being in fact no principals to notify, those advances may well be considered as having been done upon request, or something tantamount or even superior ; so as to entitle the trustee equitably to interest. This will probably distinguish it from the present case, where no such necessity existed for making advances without the knowledge of the principals.   Again ; it was obviously an equity case ; the courts of common law in that state being obliged to strain their jurisdiction to cover such cases, from their being no Court of Chancery established there ; a very hazardous guide to us, in a court of law, at least ; and when in opposition to almost every other case in the books, one not to be trusted.   But taking it as it is, there is a fact stated in the opinion of Ch. J. Tilghman, and to which he seems to give weight, which clearly distinguishes that case from the present.   Fuller, the person who made the advances, did not charge, and was not allowed any commissions or salary, or any compensation in any other shape than by way of interest.   Here Reid has been allowed a salary of $1250 for two years and six months embracing a portion of time somewhat greater than he was actually employed.   Considered as a case in equity, this circumstance would be entitled to weight, in determining the allowance of interest, whatever may be its effect on the rule of law.   But the greatest objection to this case is, that the decision is averred by the judges who made it, to be

contrary to the former rule, and to be founded on more mature reflection, which has " settled the law for a considerable time past, that interest is recoverable for money lent and advanced," The earliest case cited by the counsel in that cause, showing such a rule even in Pennsylvania, occurred in 1803, (4 Dall. 289,) only five years before *Dilworth* v. *Sinderling*. It was upon a settled and liquidated account, and therefore not applicable. Now, whatever authority the Judges in Pennsylvania may have, to overthrow a settled and acknowldged rule of law, their decisions cannot be received here for that purpose. Reported cases are only evidence of the law, not the law itself; and like all other evidence, it must be sifted and examined, to be understood. Were a witness to declare that he appeared, not to testify to a fact, but to something directly the contrary, which he believed would promote justice, he would not be heard. So when a case admits that it overthrows the law. It should cease to be regarded as evidence of that law. For these reasons, I refuse any weight to the case of· *Dilworth's lessees* v. *Sinderling*.

But, if we may look abroad for cases, to sustain and fortify our conclusions, there are two proceeding from the very respectable Supreme Courts of Massachusetts and Connecticut, which are worthy of our attention, not only on account of the sources from which they emanate ; but from their harmony with the other cases and with analogous principles. That of *Winthrop v. Carleton*, (12 Mass. Rep. 4,) is precisely like that of *Liotard* v. *Graves*, as it seems to be understood by three of the judges who decided it. The Supreme Court of Massachusetts refused interest on such advances except from the time of the commencement of the suit, because there had been no liquidation of the accounts, and no demand made.(a) In *Selleck* v. *French* (1 Con. Rep. N. S, 32,) the same principle is decided, that unless there be some promise or usage, interest cannot be allowed in a case of mutual accounts founded on mutual dealings, and where there has been no liquidation. In point of authority, these cases would seem entitled to more regard than the one in Pennsylvania.

*Winthrop* v. *Carleton*, (12 Mass. Rep. 4.) and *Selleck* v. *French* (1 Con. Rep. N S. 32.)

(a) But see note, ante p. 600.

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

Having finished the examination of the only two cases which are relied on to sustain the position, that interest is allowable on money lent or advanced without any agreement express or implied for the payment of interest, and without any liquidation of the account, or any other circumstance to show a default in the debtor, I am brought to a point in this cause, where firm ground is felt, and where we are relieved from the obscurity and inconsistency of the modern cases. It has already been alluded to incidentally.

The common law of England, as it stood on the 19th day of April, 1775, in relation to the allowance of interest on money advanced in the case of mutual credits, without liquidation of the account, has not been denied or questioned. In such a case interest was not allowable. The testimony of Lord Ellenborough and Mr. Jefferson, the chronological arrangement of the cases in the opinion of Ch. J. Savage, and the citations of the counsel on both sides, establish this position beyond all controversy. The constitution declares that it " shall be and continue the law of this state, subject to such alterations as the legislature shall make concerning the same." The legislature has made no alterations in the law now under consideration. I feel myself as much bound to adhere to that law, as if it were engrafted in the constitution in so many words ; and I can no more depart from it, than I can from any other principle of the common law. I mean not to be understood, that when the judges of England, have applied the principle of the common law erroneously, we are not at liberty to correct the application, and restore those principles to their original purity. But it should be a clear and unequivocal case of erroneous application ; and even then, we should not lightly disturb a rule settled for a century.

It has been one object of the review and arrangement of the cases which has now been made, to show that the courts in England have correctly applied the principles of the law of interest in all other cases to that of mutual accounts for money advanced and received ; and that they pursue the analogy of those cases and follow the reason of them, when they require an agreement, express or implied, to pay inter-

*The margin note reads:* The common law as it stood April 19th, 1775, on the subject under consideration.

est, to be inferred from the liquidation of an account, or some other circumstance; or such a delinquency in the debtor as justifies punishment by charging him with interest in the shape of damages. This case does not furnish evidence of such an agreement. It is deficient, in not presenting liquidated accounts, custom, former transactions, specified time of payment, or any other ground to imply one. Nor does it furnish any evidence of a knowledge by the debtors of the existence of a claim against them; which knowledge must necessarily precede the idea of a delinquency. It is satisfactory to be able to repose at once upon a clear and acknowledged rule which has never been abrogated by any competent authority, and upon a series of admitted principles in analogous cases, exhibiting the reason and propriety of that rule, and explaining, sustaining and confirming it.

The result of my opinion is, that this being a case of mutual credits, where the account was never liquidated, there being no evidence of any agreement to pay interest; and there being no default in the plaintiffs in error for not paying a balance of the existence of which they were ignorant, interest ought not to be allowed on any of the items. And if, in any case of mutual credits without a liquidated account, it could be allowed, I am of opinion that the culpable negligence of Reid, in omitting to furnish an estimate of the necessary funds as directed, and in omitting to render his accounts for more than six years after the balance accrued to him ought to preclude him or his repesentative from the recovery of any interest, but from the time when he made a demand of that balance by suit.

I am therefore for reversing so much of the judgment of the Supreme Court as allows the defendant in error any interest before the commencement of the action.

*Spencer, senator, for reversal, pro tanto.*

CRARY, Senator. On the 1st of May, 1813, all the materials and stock then owned by the directors amounted to $13,186 58. The intestate then took the active agency of the factory. The stock, materials and funds of the directors were insufficient to keep the factory in operation; and large advances were required for that purpose. The proceeds of

*Statement of the facts.*

ALBANY, Dec. 1825

Renss. Glass Factory v. Reid.

all glass manufactured after the 1st of May, 1813, were received exclusively by the intestate ; all the accounts of the corporation and the book of minutes were kept by the intestate. The factory was in actual operation from the 1st of May, 1813, to the 3d of May, 1815, when it was destroyed by fire ; and afterwards no glass was manufactured. It was admitted, that on the 2d of January 1819, when there was a meeting of the directors at his house, the intestate said to the directors, that there was a balance due to him from them. Then one or more of the directors desired him to make out his account ; and after that time the request to do it was repeated. But the account was not made out, until after the death of the intestate, owing to his habits.

On the 12th of October 1821, the general account current was rendered to the directors. The debit side of the account contained five hundred and twenty-seven items, each of which was for cash advanced or paid out by the intestate for the purpose of keeping the factory in operation. The credit side of the account contained seven hundred and eighty-seven items, each of which was for cash received by the intestate for glass made at the factory, and for other property of the directors, sold by the intestate. The whole amount of cash advanced and paid by the intestate for the directors, between the 1st of May, 1813, and the time of his death, was one hundred and seven thousand and five hundred and seventy-nine dollars and seventy-four cents. The amount received by him during the same time, and credited to the directors, was one hundred thousand and ninety-nine dollars and eighty-eight cents.

The referees were unanimous in opinion, that there was due to the intestate on the 21st of March, 1822, for principal, the sum of six thousand eight hundred and eighty-two dollars and ninety-one cents ; but they differed in their opinion on the subject of interest, the referees dissenting from the report, being of opinion that interest ought to be calculated only to the 1st day of January, 1816, and the the two referees making the report, being of opinion that it should be calculated to the 4th day of May term, 1822.

The Supreme Court set aside the report, so far as it allowed interest after the 2d day of January, 1819; and also on the charges for the salary of the intestate; and allowed interest on the receipts and advances of cash from the time of making or receiving it, to the second day of January, 1819. In coming to this decision, the court have commented upon most of the English and American decisions on the subject of interest, but have conceded that no case is to be found precisely parallel with the present. The decisions of the courts of other states are not obligatory upon the courts of this; but are entitled to great respect, as the opinions of learned men and able jurists. While the common law of England, as it existed in 1775, is adopted by the constitution of this state, and therefore obligatory on every court in it; this adoption, however, must be understood to be so far only as the common law of England is applicable to our system. On the question of interest, it is not pretended there is any difference in principle. In point of fact, the rate of interest is two per cent. less there than here. If, then, the same law is to govern, and interest cannot be recovered in England at five per cent. can it be recovered here at seven? That is the question.

Mr. Justice Sutherland, in giving his opinion in this cause, says, "It may now be considered as settled, in England that no interest is recoverable upon money lent, money had and received, or paid, laid out and expended, without an express contract for its payment, or proof that the money has actually been used by the defendant, or of special circumstances, from which an agreement to pay interest may be inferred."

Mr. Chief Justice Savage, in giving his opinion, does not controvert this position. These are the only opinions delivered in this cause. Yet the conclusion in both is to allow interest.

Mr. Justice Sutherland speaks of the present time, "now settled in England," as if it had not been long settled. How then is the fact? Mr. Chief Justice Savage says, that in *Calton* v. *Bragg*, (15 East, 223, A. D. 1812,) Lord Ellenborough said, that Lord Mansfield had set in the K.'s B. for

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

Decisions of courts of the neighboring states not obligatory; but entitled to great respect.

How far the common law is binding.

The principle on which interest is allowed, same here as in England.

The law of interest was settled in England before the American revolution

upwards of 30 years, and Lord Kenyon for more than 13 years; that he had been there above 9 years; and during all that time no case had occurred where interest had been allowed upon money lent, without an agreement for it, or for the payment of the principal, at a certain time, or under special circumstances, from which a contract might be inferred. Here, then, is the declaration of Lord Ellenborough, as to the uniformity of the decisions on the question of interest, in England for more than half a century—carrying us back beyond the period of our revolution, and the adoption of our constitution. And when, in point of fact, he is not shown to be mistaken, how can we conclude that he is so? It is an official declaration, made, in the decision of a cause, in which the length of time that the rule had been settled, is assigned as a reason for not altering it. Is it to be supposed that this declaration, made by the Lord Chief Justice of England, in the face of that nation and of the world, is not true? And, if it is true, it appears to me there is an end to this question. For no one will pretend that we are not bound, in the decision of this cause, by that rule of law which is recognized as part of the constitution of the state. If I am correct in this application of the constitution and the law, though I have other reasons, it could not be necessary to state them. But as my application may be questioned; and my opinion is founded as well upon equity and justice, as upon what I conceive to be the constitution and the law, I shall proceed to examine the law on other grounds.

It is not pretended that interest is recoverable on an unliquidated account for work and labor, or goods sold and delivered, unless the work is done, or the goods delivered, in pursuance of an agreement to pay interest.

Interest not allowable on unliquidated accounts whether of money or other things.

The reason for an exception in favor of cash accounts, I have never been able to discover, or in what particular an unliquidated cash account is different from any other unliquidated account.

The liquidation of accounts, whether for labor, goods, or money, is a matter of fact for the consideration of a jury, without regard to the nature of the items of which the account is

composed, until the facts are ascertained there is no de-
mand on which intererest can be calculated.

Interest must be computed on a certain sum; and so
long as the amount is uncertain, it forms no criterion for
the computation of interest: consequently, interest can
never form any part of an unliquidated account of any
description. It is no part of the amount due, and can on-
ly be computed on the amount when ascertained.

There is nothing in money that makes it better than la-
bor or goods. The chief use of money is to purchase la-
bor and goods. Money is only the means of facilitating
exchange; and whenever used, the commodity purchased
is paid for, and no account is necessary to be kept against
the purchaser. It is only when business is done on credit,
that accounts are necessary to be kept, and that necessity
must be limited to the commodities purchased and sold;
such as labor and goods, and can never, on principle, be
extended to money. But if cash accounts are kept, and
are unliquidated, they must be placed upon the same foot-
ing of other unliquidated accounts.

Whenever items for cash have appeared in unliquidated
accounts for other things, the items of cash have been con-
sidered by the Supreme Court, as if they were different
from other items in the same account. But I know of no
case where any reason is assigned for that difference. The
liability of the defendant to pay interest can not depend
upon the nature of the consideration for which he is in-
debted, whether that consideration is for labor, goods or
money; for that would be making a distinction where there
is no difference. Whenever the amount due is ascertained,
it must be done in the money of account of the United
States, which is dollars and cents; and whether those
dollars and cents are for husks or pearls, it can make no
possible difference. "Things equal to one and the same
thing, must be equal to another."

In practice, money to any very considerable amount is
never lent or advanced, unless the terms upon which it is
done are agreed upon between the parties. If it is agreed
that interest should be paid, the rate is fixed by the sta-

tute ; but not so where interest is not specified in the agree
ment.    The statute makes void any agreement for more
than seven per cent. but gives effect to agreements for in-
terest to that amount.    Suppose no statute on the subject,
will it be pretended that interest could be recovered ?   And
if not, on what principle can it be done, where there is no
agreement within the statute ?

It is the difference between the party who has secured
interest by agreement and the party who has neglected to
do it, that has given rise to all the devices used to recover
it.    If this difference is a sufficient consideration, it would
on the same principle, and for the same reason, justify the
Court in altering every contract complained of by either
party, as unequal or disadvantageous ; and thus make the
measure of justice, in every case, depend upon the whim of
the Court, and not upon the agreement of the parties.

But there is another view of this subject.    The intestate
was one of the principal stockholders, and most intimately
acquainted with the business of manufacturing glass ;
and well knew whether it was profitable or otherwise.
He had been concerned as a co-partner the year prece-
ding the commencement of his agency.    With his inter-
est, then, as a stockholder, and his experience and know-
ledge as an individual, he advanced and paid for the di-
rectors between the first day of May, 1813, and the time
of his death in August, 1821, one hundred and seven
thousand, five hundred and seventy-nine dollars and sev-
enty-four cents.    If the intestate had not been reimbursed,
during the same period, any part of that sum, or had
not been reimbursed the greatest part of it, by the direc
tors, the inference made by the Supreme Court, that it
must be intended that the intestate should make the ad-
vances on the credit of the directors, might be correct.
But when it is considered, that during the same period
the intestate received for glass made at the factory, and
other property of the directors sold by him, one hundred
thousand one hundred and ninety-nine dollars and eighty-
eight cents, and never informed them that there was
any deficiency, or called upon the directors for any
advances, is it not a more rational inference, that the

ALBANY,
Dec. 1825.

Renss. Glass
Factory
v.
Reid.

intestate looked to the proceeds of the sales of glass and other property of the stockholders, as the means of reimbursement, at least, so far as not to make calls upon the directors, for advances until those means were exhausted ?

If the directors put into the hands of the intestate the means of creating a fund, and he looked to those means and that fund for reimbursement, and made the advances upon the credit of the fund, which he thus had the power of creating, and has never been deprived of that power, and has always had the benefit of that fund, his expectations are as fully realized, as if he had · the bond of the directors, under their corporate seal, and they had tendered to him a full and complete performance of it; for the best, and most satisfactory performance, is that which equals the expectations of the parties. "Whatever is expected by one side, and known to be so expected by the other, is to be deemed a part or condition of the contract;" and that is a principle of universal law.

The chief business of the intestate, as agent, had ceased on the 3d of May, 1815, when the factory was destroyed by fire. From the account of the intestate as exhibted after his death, the balance of principal claimed, was $7379 86. It does not appear that the intestate had even intimated that a balance was due to him, until the 2d day of January, 1819; and that is the day to which the Supreme Court allow interest to be computed. But the reason for resting on that particular day does not appear. It is assumed, however, that it must be on account of the intimation of the intestate to the directors, that a balance was due at that time. If the intestate had, at the same time, exhibted his account, and such account had not been objected against, it might have been considered as liquidated, and such liquidation might have warranted the allowance of interest after that time. But on what principle an intimation that a balance was due, followed by a request to make out the account, which was not done, should have the effect of giving interest to that time, and of preventing the accumulation of it thereafter is inconceivable to me. And it is equally difficult for me to conceive, how such intimation and request,

so long as the account was not exhibted, should have any operation or effect upon the rights of the parties.

In giving the opinion of the Supreme Court, it is said to be " stated in the case, that when the intestate was appointed agent in 1813, the stock, materials and funds of the directors were insufficient to keep the factory in operation, and large advances were required for that purpose." It is then asked, " what then was the understanding of the parties as to the manner of carrying on the business ? How were those advances to be made, and by whom? And on what terms ? Without funds the business could not be prosecuted. Had the directors intended to furnish the necessary funds themselves, they would have made a further call upon the stockholders. Not having done so, they must have intended that the advances should be procured in some other way ; and of course, by the agent, as he was the only active person engaged in the business, and had, the preceding year, made the advances in the same business." This is assuming facts that do not appear, and then reasoning from them as if they existed. The preceding year, the intestate, Robert Alsop, and the directors, entered into a copartnership, under the name of John Reid & Co., for the purpose of manufacturing glass ; and by the articles of copartnership, it was stipulated what each one should do ; but at the end of the year, when the intestate took charge of the business as agent of the directors, no such stipulation was entered into between the parties ; and that is one point of difference between the two cases. Another is, the parties are not the same. If there is any implication of law as applicable to a tenant holding over, it can only exist as between the parties ; but the application of such a rule to this case might be questioned on other grounds. The interrogations are also made upon a misapprehension of facts. It now appears, that the stock, materials and funds, were insufficient to keep the factory in operation. But did it appear before the advances were made ? And if so, who knew it ? The intestate was the only person who had charge of the business ; and, consequently, the only person to whom the fact could be known. It is true, it was his business to know it

and his duty to communicate it. But it was not done. And that is the reason, calls were not made, and could not ne made, by directors, upon the stockholders. On such a state of facts, how can it rationally be supposed, that the directors expected that the intestate should make the advances, merely because the directors did not make the calls when, without notice from the intestate, they did not, nor could they know that any sum was required.

The sense of the parties, as indicated by their acts, evidently is, that the proceeds of the sales of glass, and other property of the directors, should be disbursed by the intestate as their agent, if necessary, in carrying on the business and keeping the factory in operation. And if such proceeds were not sufficient, it was expected the intestate would notify the directors, which he did not do ; but proceeded to make the advances without giving such notice : thus, not only neglecting his duty, but transcending his authority as an agent. It follows, therefore, that the intestate was the delinquent, and the court are now called upon to reward his delinquency, not merely by reimbursing the money advanced, but to do it with interest.

If the above reasoning is correct, it would go to preclude any recovery for either principal or interest. But there is no question as to the principal. If, however, it was in question, and could not be recovered, can any recovery be had for the interest? If the directors had received any profits from the use of the money advanced by the intestate, it would be just and equitable that they should be charged with the interest to the amount of such profits ; or had the money been advanced at the request of the directors, they would then have assumed the risk, and without regard to the profits, been justly chargeable with the interest. But when we consider the money voluntarily advanced, not on the credit of the directors, but on the credit of the business, a business conducted solely by the intestate, why should the failure of the business give him a claim upon the directors for interest? Had the directors known, as the intestate must have done, that manufacturing glass was a losing business, it is not to be supposed they would have continued

If the directors had been profited, cr requested the advance of the money they must have allowed interest.

it. This information they had a right to expect from the intestate, but did not receive. And is it just or reasonable that he should profit by his neglect, when that profit must be at the expense of the directors? What have the directors done, that they should be visited with such penalties? At the commencement of the intestate's agency, the stock and materials of the directors amounted to more than thirteen thousand dollars. During the continuance of that agency, that stock, and those materials were swallowed up and lost. No dividends have been declared or received; and the directors are now called upon for more than twelve thousand dollars. These suggestions of hardship ought not to have any influence in deciding upon the rights of the parties; and would not be mentioned by me, if I could perceive that the intestate had any legal or equitable claim to interest.

If there be no case parallel with the present, allowing interest, it is an additional reason why none should be allowed.

It is conceded by the Supreme Court, in giving their opinion, and there is no case parallel with the present. If this concession is true, it may be questionable whether it ought not to be sufficient to reverse this judgment. I have always considered justice best administered, when the Court pronounced the law as it was at the time of the decision. The legitimate power of the court is limited by the law of the land; if not exercised according to that law, it is done against right, and is a usurpation. Now rules of property should be established from the principles deduced from analogous cases, and the fitness of things: but old rules should never be altered for such causes. The community suffer less from the number of new rules, than from the alteration of old ones. The ends of justice require that the law should be certain. If the facts presented in the present case had never before existed in any other, the decision of the Supreme Court would not be complained of as erroneous.

No case to be found, where agents, attorneys or solicitors have advanced money of allowing interest till after liquidation.

But, in practice, the same facts must have frequently occurred. The disbursements of agents in conducting the business of their principals, of attorneys and solicitors, in the progress of their client's causes are every day cases, that happen as often as agents are appointed, and attorneys and solicitors retained. Yet no case is to be found where interest

was ever allowed for such disbursements, until after the liquidation of the account.    This is the simple case of an agent, possessing unlimited power over a particular business of his principals, voluntarily making advances in a losing business, known only to himself, and charging interest on such advances.; yet omitting, for more than six years after the chief business of his agency had terminated, to furnish his account; and then claiming interest from the time the advances were made.

ALBANY,
Dec. 1825.

Renss.    Glass
Factory
v.
Reid

The security, for capital, that is given by the government and laws of any country, is the strongest inducement to the accumulation of it.    And in a nation like this, where so much capital is employed in the hands of agents, I should shudder at a decision, giving to the agent the right of swallowing up that capital, by interest on advances of his own, voluntarily made, in a losing business, known only to himself, and not disclosed to his employers.    The force of principle might compel me to yield to such a rule, if settled as the law of the land; but I cannot do it on the score of comity.    And I must say I should mourn over that land, were I an inhabitant of it, where such a rule prevailed.

The legal security of capital, the strongest inducement to its accumulation.

If this had been an ordinary case, I should have contented myself with giving my opinion without my reasons. But viewing the decieion of the Supreme Court, as I do, not only erroneous in principle, but fraught with incalculable mischief to the community, I have taken the liberty of troubling the court with these reasons; and such is my apology, if any is necessary, for doing it.

BURT, CLARK, DUDLEY, GARDINER, LYNDE, WILKESON, WOOSTER and WRIGHT, Senators, concurred in the result of these opinions.

But a majority of the court concurring in the result of the opinions delivered by SANFORD, Chancellor, and COLDEN, Senator,

For affirmance, 15; for reversal, 10.

It was thereupon ORDERED, ADJUDGED and DECREED, hat the judgment of the Supreme Court be, in all things, tffirmed, &c. and that the record and proceedings be remitied, &c.