LUCY WHEELOCK, Executrix, etc., Respondent, v. WESTEL R. TANNER and others, Appellants.

A tender of performance may be accompanied with such conditions as were, by the terms of the contract between the parties, conditions precedent to be performed by the party to whom the tender is made.

Where a payment was to be made by the delivery of wagons, and the wagons were ready for delivery at the time and place stipulated, and were not actually delivered, because the party was not then ready to receive them, and were kept by his request, until he was ready, etc.,— held, that a further tender of the wagons was unnecessary, and that, from and after the time when the wagons were ready to be delivered according to the terms of the contract, no further interest could be charged on the debt to be thus paid.

ACTION to foreclose a mortgage executed by the defendants to one Fisk, and by him assigned to the plaintiff's testator. In April, 1857, the defendants purchased of Fisk certain real estate in Booneville, Oneida county, consisting in part of a wagon shop and premises, and executed to him a bond and mortgage for the whole of the purchase money, amounting to $7,750. The mortgage covered the whole of the premises purchased. The bond was payable in lumber wagons, at a stipulated price, to be delivered at such places as the mortgagee should designate, in seven installments of $1,000 each, and one of $750, with interest on the whole sum remaining unpaid, payable with each installment of principal. The last two installments fell due respectively on the 15th day of May and the 15th day of June, 1860; all the previous installments were paid in the manner stipulated and at the times they respectively fell due, with interest. At the time of the purchase by the defendants there was a mortgage on one of the parcels of land, executed by Fisk, and another to one Tuttle, to secure the payment of about $3,752, which was payable in installments, and it was a condition of the bond and mortgage in suit that Fisk was to pay the installments of the mortgage to Tuttle as they fell due, and if not, that the defendants might suspend the payments on their bond and mortgage until such payments were make by Fisk;

and it was a further condition of the bond and mortgage of the defendants, " that in case the said incumbrance upon the said described .piece of land shall not be extinguished by the said Fisk by the 15th day of May, 1860, then the said assignors may suspend and withhold the payment due at that date, and all further payments herein, until the said mortgage to said Tuttle shall be extinguished ; and such suspension and withholding of payment shall not be a breach of this condition, as aforesaid." On the 15th day of May, 1860, the mortgage to Tuttle was not extinguished, there being still about the sum of $800 due and unpaid thereon. On that day the defendants had ninety wagons completed and ready for delivery on their bond and mortgage. They amounted, at the stipulated price, to $1,400, and the amount of principal and interest due on that day was $1,112.29. On that day Fisk, who still had the bond and mortgage, called at the shop, inquired if the wagons were ready for him, and being informed that they were, went into the yard and looked them over. He made no objection to the quality of the work, but stated that he was not ready to take them away at that time, and arranged with the defendants to store them for him and at his expense, until those necessary to complete the June payment should be finished, when he would take them all away together. The defendants thereupon took the wagons to pieces and stored them for Fisk upon their own premises as agreed. On or before the 15th of June the number of wagons necessary to make up the amount of both payments, with interest, were completed and stored with the others. In the mean time, viz., on the 23d of May, Fisk had assigned the bond and mortgage to Charles Wheelock, the plaintiff's testator, though the defendants had no notice of that fact till after storing the last of the wagons. In the following October the defendants, needing the room occupied by the wagons, removed them to Post's store-house, on the canal, and procured them to be stored there. On the 19th of August, 1861, matters being in the same situation as at the date last mentioned, the defendants served upon Wheelock a written notice that the wagons, to pay the mortgage, were

at Post's store-house ready for delivery; that they were thereby tendered to him; that the Tuttle mortgage was in arrears; that the defendants demanded satisfaction of their mortgage, and that unless he, Wheelock, satisfied that mortgage and relieved their property from the incumbrance of the Tuttle mortgage within ten days, legal proceedings would be taken in the premises. Nothing, however, was done until the last of September following (1861), when, the Post store-house being needed for barracks, the defendants called upon Wheelock to know what should be done with the wagons, at the same time stating to him what they had paid for the storage of the wagons at Post's, and what they charged for the previous storage on their own premises, and for their trouble. Wheelock assented to these charges and desired that the wagons should be removed to premises of his own in the village, where there would be no more storage to pay; but upon ascertaining that they could not be removed to that place without injury from mud, asked that they should be again stored in the defendants' buildings, which was done. About this time Wheelock proposed to defendants to sell them one of the wagons to pay his indebtedness for storage and another item of account against him for repairing some muskets, but the proposition was not accepted. The wagons remained stored in defendants' buildings till the following April (1862). In the mean time Wheelock talked with the defendants about getting the wagons and settling up the business. The defendants expressed their willingness to give up the wagons at any time when the Tuttle mortgage should be arranged. Wheelock claimed that one Hulbert was bound to pay the Tuttle mortgage, and it was finally arranged that if Wheelock would procure from Hulbert a mortgage to the defendants on another piece of land, conditioned for the payment of the Tuttle mortgage, and would add his personal guarantee thereto, and would cancel the defendants mortgage, they would give up the wagons. This arrangement was so far carried out that the defendants received Hulbert's mortgage and Wheelock's guaranty about the 10th of March, 1862, and the parties soon after met to compute the

amount due on the defendants' bond and the number of wagons required to pay it. It was agreed, that if the amount due should call for a certain number of wagons and more than half of another, Wheelock should take one more wagon and pay the defendants the balance of its price in cash; but if the excess over a certain number of wagons should be less than half the price of a wagon, the defendants should credit that excess to Wheelock in their account against him for storage, etc. Shortly after this Wheelock requested, and the defendants agreed, that if his boys should find sale for any of the wagons, that they should set them up for them. At the same time Wheelock consulted the defendants as to where he could probably find the best sale for the wagons, and, upon their recommending St. Lawrence county, proposed to employ one of the defendants to go there with his boys to assist in making sales. And it was at the same time agreed, that, as the business was about settled up, the defendants would charge no more storage for the wagons. The computation of the amount due took place in April, 1862. Interest was computed to the 15th of June, 1860, and was not claimed for any longer time. The amount due was found to require for its payment twenty-seven wagons, and about ten dollars over. The defendants then requested Wheelock to cancel their mortgage, as agreed, and they would credit him the small excess upon account. Wheelock said he was to leave home the next morning, and would not have time to attend to it, but that he had given a power of attorney to his son, Morton Wheelock, and he would do it. Nothing more was done until the 30th of April, when Morton Wheelock, as agent for his father, demanded wagons to pay the amount due on the mortgage, with interest due up to that day. The defendants offered to give up to him the wagons which had been made and stored for his father, and which had been found sufficient to pay the mortgage with interest to June 15th, but declined to pay interest after that date. Morton Wheelock then refused to receive the wagons, and the bill in this action was filed to foreclose the mortgage. The cause was tried by the court without a **jury**, and the

findings of fact and conclusions of law, to each of which the defendants excepted, are as follows :

"1. That the mortgage was given to secure $7,750 in money.

"2. That it was capable of being discharged by a sufficient tender of wagons, as to number, quality and kind ; but if not so discharged, the mortgagee was entitled to the money, or a decree of foreclosure.

"3. That there was a balance due in May and June, 1860, which has not been paid, nor was there ever in that year any sufficient tender. The offer that was then made was conditional, and the property never placed at the disposal of the mortgagee. The reason alleged was the outstanding Tuttle incumbrance ; and it was never the intention of defendants to put the property at the disposal of the mortgagee until that matter was arranged.

"4. The property remained with the defendants until April 30, 1862, when a demand was made on behalf of the plaintiff to fulfill the contract by delivering the wagons at a designated place and paying the interest claimed to be due. The defendants offered to deliver for all purposes, except to pay the interest which they insisted was not due, and did afterward deliver, as they claimed, wagons enough to meet the whole payment due on the mortgage.

"5. The offer of tender was insufficient, *for the reason that nothing was offered as applicable to interest ;* and, by the condition of the bond, interest was due and payable by defendants. This is the clear and explicit language of the bond, and defendants, having held and enjoyed the property which was the consideration of the mortgage, were equitably bound to pay the interest. The clause in the bond allowing defendants to suspend the delivery of wagons until the Tuttle incumbrance should be removed, only operated to extend the time of payment, and prevent a forfeiture of the bond, and thus exempt them from the liability to a foreclosure, *but did not stop the running of interest on the bond.* The tender was consequently insufficient.

"6. The alleged outstanding Tuttle incumbrance did not

discharge defendants from the obligation to pay. That had been, prior to April 30, 1862, satisfactorily adjusted by the mortgage of Hulbert, which had been accepted by the defendants. They made no such claim when the demand of the 30th of April was made, but put themselves strictly on compliance, and in this they failed by an insufficient tender.

"7. It results, that, no payment nor tender sufficient to discharge the bond having been made, the defendants are not entitled to have any thing credited upon it, but the plaintiff is entitled to have a decree declaring the amount due upon the bond to be $2,298.33, and on the foreclosure and sale of the premises in the usual form, with costs." .

Judgment of foreclosure and sale was entered accordingly, which was affirmed at the General Term, and the defendants appeal to this court.

*C. H. Doolittle,* for the appellants.

*F. Kernan,* for the respondent.

DWIGHT, J. . I think the court below erred in finding that there was not, in 1860, a sufficient tender of wagons to. pay the installments due in that year. The facts bearing upon that question are uncontroverted, and the question whether they constituted a tender was, therefore, purely a question of law, and may be reviewed here. (*Pratt* v. *Foote,* 9 N. Y. 464; *Farmers' Bank* v. *Vail,* 21 N. Y. 486.)

The finding is, that the tender was bad because accompanied by the condition that the Tuttle mortgage should be discharged. It is not found that the tender was insufficient in the quantity or quality of the property tendered, and, as there was no objection to it on the latter ground, it must be held to have been sufficient in those respects. The question is, therefore, whether imposing the condition of the discharge of the Tuttle mortgage before the property should be delivered, vitiated the tender. There is no question but that the defendants were entitled to have the Tuttle mortgage discharged before they could be required to deliver the

wagons. Such was the letter of the bond. The condition was, therefore, one upon which the defendants had a right to insist, and to which the holder of the mortgage had no right to object. Such a condition does not vitiate a tender. (2 Parsons on Cont. 154; Chitty on Cont. 695.) The discharge of the Tuttle mortgage was, by the bond, a condition precedent to the defendants' liability to pay, and a tender of payment on such condition was therefore a tender of full performance of the defendants' obligation. But, in my opinion, the undisputed evidence in this case showed, not merely a tender, but actual performance on the part of the defendants, and acceptance of the property on the part of the holders of the mortgage. The bond provided, that the wagons should be " delivered at such store-house, on the Black River canal, in the village of Booneville, as the party of the second part (the mortgagee) should direct." It is undisputed that, on the day when the payments of May and June, 1860, respectively, became due, the defendants had the number of wagons requisite to make those payments at their workshop, completed and ready for delivery; and this, until some place of delivery was specified by the holder of the mortgage, would have been full performance on their part had nothing more occurred between the parties; but more did occur, and those subsequent transactions, it seems to me, constituted an acceptance on the part of the holders of the mortgage, and an actual transfer of the property in the wagons. Twenty wagons were completed and ready for delivery on the 15th day of May. These were more than sufficient to make the payments then due. On that day Fisk, who still held the mortgage, came to the defendants' shop and inquired for the wagons; they were shown him and he looked them over and made no objection to their quality or sufficiency in any respect. He declared himself not ready to take them away at that time, whether because he was not able then to give a discharge of the Tuttle mortgage does not appear; but he arranged with the defendants to store them for him, and at his expense, until the number necessary to complete the June payment should be also

finished, when he agreed to come and take them all away together. Accordingly the defendants took the wagons to pieces and stored them on their own premises, as requested. There can be no doubt that here was an acceptance on the part of Fisk, and that the property in these wagons was from that moment in him, subject only to the defendants' right to retain the possession until the Tuttle mortgage should be discharged. Delivery of possession was not necessary to effect a transfer of the property ; the case was not within the statute of frauds. And the property passed, even though the right of possession remained in the defend ants until the performance by Fisk of his covenant to procure a discharge of the Tuttle mortgage. (*Hinde* v. *Whitehouse*, 7 East. 558.) If the defendants' store-house had been burned the following night, without their fault, and those wagons destroyed, the loss must have fallen upon Fisk, and the mortgage have been held *pro tanto* discharged. It is also proved, and undisputed, that on or before the 15th of June the number of wagons necessary to complete the pay- · ment due on that day, with interest, were finished and stored with the rest, Fisk still failing to designate any place of delivery, and the defendants having no notice of the transfer of the mortgage to Wheelock. This, as it seems to me, ful- filled the measure of the defendants' obligation. Nothing remained for them to do. Delivery was impossible until a place of delivery should be designated, and a tender of delivery was unnecessary, because Fisk knew that the wagons were stored for him, and he had agreed to come and take them away. What remained to be done was clearly the duty of the holder of the mortgage. His covenant to procure a discharge of the Tuttle mortgage was still unper- formed, and, until that was done, he had no right to have the wagons. This view of the case seems to have been accepted and acquiesced in by Wheelock from the moment when he became the owner of the mortgage. The whole case from that point seems to me to show, that he regarded those wagons stored by the defendants as his own, and that his solicitude and effort were not to obtain payment of his

mortgage, but to obtain possession of his wagons. With no other view of the case is it possible to reconcile his acts and declarations disclosed by the evidence. He recognized and assumed Fisk's agreement to pay for the storage of the wagons; he liquidated the amount due the defendants therefor; he proposed to turn out one of the wagons to pay the amount thus liquidated, with other items of account; he requested, at one time, to have the wagons stored on his own premises, in order that he might have no more storage to pay; he arranged that in case his boys should find sale for one or more of the wagons from time to time, the defendants should set them up for them; he consulted with the defendants as to where the wagons would be best sold, and proposed to employ one of them to assist in making sales, and, lastly, he effected the arrangement with the defendants by which they were to accept the Hulbert mortgage with his own guaranty, and give up the wagons; all of which facts seem to me to show that he considered the wagons to be his, and that the defendants' possession of them was merely as security for the performance of Fisk's covenant, assumed by himself, to pay off the Tuttle mortgage. That the arrangement as to the Hulbert mortgage was an agreement on the part of the defendants to accept it, with Wheelock's guaranty, as a substitute for their lien upon the wagons, and did not constitute a waiver of the condition of their bond, is clear from the undisputed evidence in the case. Upon that subject the plaintiff gave no evidence whatever, and the evidence of the defendant Tanner is the only proof in the case bearing upon the transaction. He says, "Wheelock asked me if I would *give up the wagons* if Mr. Hulbert would get us a mortgage," etc. "I told him I would if he would guarantee it and cancel our mortgage. Wheelock said he would if Mr. Hulbert would get the mortgage, and he thought he would. A paper purporting to be that was made to me individually, and Wheelock guaranteed it." Upon his cross-examination he gave the same account of the transaction, and there is no other refer ence to it in the evidence. This evidence certainly goes no

further than to prove an agreement on the part of the defendants to give up to Wheelock the wagons in store for him, and to establish his right to have them at any time after furnishing the proposed security. This effect was conceded to it, as appears from the subsequent narrative of the case. The parties came together soon after to ascertain the exact amount due on the mortgage, and the amount was computed, with interest, up to the 15th day of June, 1860, and not later, and no claim was made that interest was payable for any longer time. Upon this basis the whole matter was adjusted, and Wheelock agreed that the defendants' mortgage should be canceled and the wagons taken away. Thus do all the facts in the case, as it seems to me, argue in support of the conclusion that there was acceptance by the holders of the mortgage of the property in the wagons manufactured and set apart for the two payments of May and June, 1860, and that the possession by the defendants after that time was by way of lien for the performance of the covenant of the mortgage, and hence that there was no breach of any condition of their bond on the part of the defendants. But even if the transactions described by the evidence did not constitute performance by the defendants, yet there could be no breach on their part till the Tuttle mortgage was discharged, or that condition waived by them. There is no pretence that that mortgage was discharged, and I am of opinion, for the reasons already stated, that the court at Special Term erred in its finding to the effect, that the transaction in respect to the Hulbert mortgage was a waiver of that condition. If the views heretofore expressed are correct, then, upon strictly legal grounds, the plaintiff's action must be defeated. But the decree entered below is also highly inequitable. It requires the defendants to pay interest for over two years on a sum of money of the use of which they were during all that time deprived, by the neglect or inability of the mortgagee to perform his covenant in respect to the Tuttle mortgage. In the finding at the Special Term it is held, that the defendants, having enjoyed the property which was the consideration of the mortgage,

they were equitably bound to pay the interest. But this finding overlooks the fact that, while they enjoyed the property, they had, so far as their use and enjoyment was concerned, paid the full purchase price of it. The wagons stored for Fisk and Wheelock represented the entire balance of that purchase price, and the defendants were as much deprived of the use of the money invested in those wagons as if they had been delivered to the mortgagee. On the other hand, it is suggested, that the defendants might have sold the wagons and had the use of the money until it was called for by the holders of the mortgage. But to this proposition there are several objections. In the first place, in the view of the case taken by me, the property in the wagons had passed from the defendants, and they had no right to dispose of them until there was a refusal to receive them by the mortgagee. But even if this were not so, the defendants were liable to be called upon at any time with a tender of a discharge of the Tuttle mortgage, and a demand of payment, and either the wagons or the money must be kept on hand to meet the demand and save them from default. The evidence also discloses the fact that there was not a market for such a number of wagons at the place of manufacture, but that the mode of sale was to send them to a distant section of the State, or even to another State, and peddle them out. Besides this it is sufficient to say, that the defendants had a right to pay in wagons at a fixed price, and it was probably to their advantage to do so.

For all the reasons above considered, and on grounds both legal and equitable, I conclude that the decree in this action cannot be sustained.

The judgment below should therefore be reversed, and a new trial granted.

WOODRUFF, J. The result of this action works very great hardship and, as I think, manifest injustice to the defendants. The rules of law applicable to the facts proved, do not require such a result.

The plaintiffs (passing over prior payments which were

made) were bound by their bond and mortgage to pay to the mortgagee, in wagons of a specified description and quality, one thousand dollars, with interest, on whatever remained unpaid on such bond and mortgage by the 15th of May, 1860, and seven hundred and fifty dollars, with like interest, by the 15th of June, 1860, the wagons to be delivered at such store-house in the village of Boonville, and on the Black River canal, as the mortgagee might direct; but, with a proviso, that if the mortgagee should not pay off a mortgage due by him, which incumbered the premises of the mortgagors, then the payments by the mortgagors so provided to be paid, may be suspended until such second named mortgage shall be extinguished.

The mortgagors manufactured the wagons required for the fulfillment of their obligation, and on the 15th of May, 1860, had completed, and in readiness for delivery, twenty wagons, and were fully prepared to deliver them in discharge of their obligation. That obligation not limiting the amount, which they might pay if they saw fit, on the 15th of May, to just $1,000 and interest, they had a perfect right to offer the whole twenty, although they would operate in part satisfaction of the June payment.

The mortgagee had designated no store-house at which they should be delivered, and the wagons were at the shop of the defendants in Boonville, where they were made. And on or about the 15th day of May, the mortgagee came to the defendants' shop and inquired of them if the wagons were ready for delivery, and was told that they were. He thereupon stated that he was not ready to take them away, and proposed to the defendants that they should take them down and store them for him until the next lot was ready, and then he would probably know what he was going to do with them, and would take them all away together. The defendants consented, and he examined the wagons and promised to pay them for their trouble, and the defendants thereupon took the wagons "to pieces" and stored them in their barn.

The defendants then finished other wagons, and had them in readiness to be delivered by or on the 15th of June; but

the mortgagee having made no designation of a store-house, they remained for several days at the defendants' shop, and the defendants then stored them with the others to meet the assurance of the mortgagee that he would take them all away together. And the wagons were kept in store from that time onward until the disagreement between the parties, which led to this action to foreclose the mortgage and recover money in lieu of wagons.

Again, after the mortgage in question had been assigned to the plaintiff's testator, the store-house in which the wagons were stored being required for other uses, the defendants apprised the testator of that fact, and he first directed that they be placed in his barn in order that there might be no more storage to pay, but upon suggestion that the street was muddy, he said he did not want them muddied, and proposed their being placed in the defendants' buildings, and it was done. He was then informed of the amount the defendants had been required to pay for the storage in the store-house, and that they should charge it to him, and he assented, stating that it was all right.

The facts above stated were proved without contradiction, and though there is no finding of facts in detail, the question, what was the legal operation or effect of these facts, properly arises on the findings of the judge before whom the action was tried.

Other evidence showed that on the days above named, the mortgagee had not extinguished the prior mortgage on the defendants' premises, and it appeared that the defendants did not intend to give up their control over the wagons until that was done.

In April, 1862, an arrangement had been made by which other security for indemnity against such prior mortgage was given and accepted by the defendants, and the assignor of the mortgage now in question demanded the wagons and designated a store-house to which they should be taken. The defendants claimed that they ought not then to be required to move the wagons again, but nevertheless they drew the wagons to the place designated.

Hereupon the question arose which led to this controversy and to the present appeal. Passing by some negotiations which were claimed by the defendants to amount to an agreement between the parties on the details of the final settlement, the plaintiff's testator finally refused to accept the wagons because the number was not sufficient to pay the sums due, with interest down to April 30, 1862, when the final demand was made.

The defendants did draw to the place designated for the testator's acceptance, wagons enough to pay the sums due, with interest to the respective days, May 15 and June 15, 1860, mentioned in the bond or mortgage, but refused to pay interest after that time.

The court below held, that, notwithstanding what the defendants did toward the performance of their undertaking, interest continued to run against them down to the time of such demand, and therefore by their refusal to pay it they became liable to pay the whole in money, lost the privilege of paying their debt in wagons, and judgment of foreclosure is pronounced against them.

It is not disrespectful to say that this is a harsh judgment against the defendants, who, as it seems to me, have been industrious and prompt in performing their whole duty, have suffered inconvenience and loss from the plaintiff's delay in the discharge of his duty to them, had made and could make no profit by his failure to do so, and the consequent putting off the final delivery of the wagons to his possession.

The court below have regarded the rules of law as leading necessarily to this result, and if that be so, then if the judgment be harsh, the defendants must bear it.

The general principles governing the decision are unquestionable.

The defendants are to be deemed debtors to the amounts named in their bond and mortgage.

The right to pay their debt in specific articles was a privilege for their benefit. If they did not exercise their right according to their bond, the plaintiff is entitled to money to the amount due to him.

And if they were in default in not performing according
to the conditions of their bond, the debt would bear interest
until it was paid.

But in the conclusion of the court below in respect to the
effect of the transactions of May and June, 1860, I think
there is error.   It is stated in these words :

" There was a balance due in May and June, 1860, which
has not been paid, nor was there ever in that year any suffi-
cient tender.   The offer that was then made was conditional,
and the property never placed at the disposal of the mort-
gagee.   The reason alleged was the outstanding Tuttle in-
cumbrance, and it was never the intention of the defendants
to put the property at the disposal of the mortgagee."

Upon this view of the effect of what was done by the
defendants, and upon this alone, it is that they are charged
with interest until that mortgage was removed or otherwise
arranged.

The bond provided that the sum secured should be paid by
installments, on or by specified days, and that with each
payment there should be paid interest upon all sums unpaid
that shall accrue thereon up to the time of payment of each
installment.

And while it is conceded that the defendants were not
bound to deliver the wagons until the prior mortgage was
extinguished by the mortgagee, and were in no default for not
delivering the wagons unreservedly to the mortgagee, they
are declared chargeable with interest if they did not see fit
to waive their security and make an unconditional tender of
the wagons.

In the first place, the reasonable construction of the bond
does not require this, and in the next place the principles
which govern a court of equity in imposing interest, forbid it.

The instrument by its terms declares what shall be paid
and when, and what interest shall be paid.   Installments are
to be paid on separate days, and with those installments, and
at the time of payment, there shall be paid interest upon all
sums accruing upon sums unpaid up to the time of payment
of each installment.   The fair and reasonable meaning of

this is, for example: On the 15th of May, $1,000 shall be paid, and therewith shall be paid interest upon all sums remaining unpaid upon the bond up to the time of that payment. A computation of that interest fixes the exact sum which, by the condition of the bond, was payable on that day, and that sum is the amount due by the contract, and it is that payment, *i. e.*, the payment of so much for principal and interest which is suspended, if the mortgagee does not by that time extinguish the prior incumbrance.

The bond does not read that the time for paying the installments shall be extended in that event, or the payment of the installment shall be suspended. If it did, I think, upon views hereafter presented, the defendants were not in this case chargeable with interest after June, 1860. But it reads: The party (defendants) may suspend the payment due at that time, *i. e.*, the sum then payable for principal and interest, and any further payment until the said mortgage to Tuttle shall be extinguished.

Undoubtedly the general rule is, that where there is an obligation for the payment of money, or of money and interest on a day named, the interest continues to accrue until payment, or until something is done which, in respect to the question of interest, is equivalent to payment. That is, I apprehend, the rule applicable to this case, and I do not consider it material to consider whether the interest after default be regarded as damages for the default, or be deemed to accrue by virtue of the contract; but I do insist that nothing in the language of the instrument under consideration created a different rule of liability and made the defendants chargeable with interest whether in default or not, as the necessary legal effect of the bond.

The defendants, on the 15th of May, had manufactured twenty wagons, and were ready at their manufactory to deliver them. That was the proper place for delivery under their bond. The mortgagee had a right to designate a storehouse where delivery should be made, but, not having done so, the defendants were at liberty to hold the wagons at their

own manufactory, in readiness to deliver, and that was performance on their part.

This, however, is not all; upon the application of the mortgagee, the wagons were submitted to his examination, and the defendants declared their readiness to deliver. Thereupon a distinct arrangement, upon sufficient consideration, and based upon the mortgagee's declared want of readiness to take them, was made. It was agreed that the defendants should take down the wagons,—*i. e.*, separate their several parts and store them,—and he would pay them for their trouble; and the defendants stored them accordingly. If this had been an ordinary manufacture of wagons, upon an order therefor, or a sale of wagons, I hesitate very little in saying, that this was an acceptance of the wagons, and that they were thereafter held at his risk of loss by inevitable accident, and that the manufacturer had thereupon a complete right of action for the price. Not amounting to a waiver of the lien for the price, such a waiver is not essential to a complete performance by such a manufacturer, or a vendor, in order to entitle him to all the benefit to result to himself from the contract.

So here, in my opinion, the defendants had placed themselves in a position to claim the like benefit of performance on their part, and the circumstance, that they still retained their lien upon the property, secured to them by the agreement, as security for the discharge of an incumbrance on the premises, the purchase-price of which they were thus paying, no more impaired the effect of their tender of the goods, than the possession of the seller of goods under his lien for the price hinders his recovery of the price from the buyer. A vendor is not bound to make an unconditional tender of possession of the goods, in order to enable him to allege an absolute sale, a full performance by him and a right to immediate payment.

And, further, when, in June, the residue of the wagons were completed, they were at the proper place in readiness for delivery, the mortgagor had not only not designated any other store-house at which they should be delivered, but his

promise to the defendants, requesting them to store the first twenty and in June he would take them all away together, warranted the defendants in storing them with the others.

And this view of the whole subject is strengthened by the fact, that subsequently the respondent's testator assented to the charge of the storage paid by the defendants for these wagons, as a proper charge by them, declaring that it was right.

Some claim was made, that the defendants are chargeable with interest, upon the principles which govern a court of equity on the subject of interest where specific performance of an agreement for the purchase or sale of real estate is decreed. On the contrary, those principles are in full support of the claim of the defendants to be relieved from such payment.

The fallacy in the argument was, that it was assumed that the contract under examination was the original agreement for the purchase of the mortgaged premises; on that assumption it was argued that, inasmuch as the defendants have had the possession and enjoyment of those premises, it is equitable that they should pay interest on the price. That is not the contract which is the subject of the present inquiry; the defendants do not deny and have not denied their duty to pay interest; it was stipulated in the bond; what they claim is, that they have performed on their part all that was essential to constitute performance, except so far as they were prevented by the default of the mortgagee, and so are not themselves in default.

Here the rule and practice of courts of equity above referred to, applies with striking force:

When a purchaser, although in possession, is ready and offers to pay at the appointed time, but the vendor is not ready with his deed, and the purchaser holds the money in readiness to pay whenever the deed shall be tendered and the purchase price is demanded, the purchaser is not chargeable with interest. (*De Visme* v. *De Visme*, 1 McN. & Gor. 352; *Regent's Canal Co.* v. *Ware*, 23 Beav. 575.)

The court is governed on that subject by what is deemed

equitable under the circumstances, and, where the purchaser is in no default, but ready to perform and has given due notice, will see that he suffers no' loss and that the vendor makes no profit. (See on this subject Fry on Sp. Per., ch. 4, p. 377, *et seq.*) Here it is said that the defendants could have sold the wagons and enjoyed the use of the proceeds. I am of opinion that what took place on the 15th of May, after a distinct examination of the wagons, and what I deem equivalent to an acceptance of them by the mortgagor, and an undertaking to store them on the one hand, and to pay the defendants therefor on the other, amounted to a specific appropriation of those wagons, so that, on tender of the extinguishment of the prior lien, the mortgagor might have demanded those identical wagons, and maintained an action to recover the possession thereof, and if the defendants had sold them, might have brought trover, as for an unlawful conversion. But if it were conceded that other like wagons were to be delivered in their place, the defendants could not, with safety, sell the first; they were liable to be called upon on any day to deliver, and were bound to be ready instantly, on demand, if the former lien was extinguished, to deliver the whole.

Upon these considerations my conclusion is that the defendants were not liable for interest, and their subsequent delivery of wagons in payment of the principal and the interest down to May 15 and June 15, respectively, was a complete defense to the action, and that the judgment should therefore be reversed, and a new trial ordered.

MASON, J. This action was commenced in the Supreme Court to foreclose a mortgage executed by the defendants to John M. Fisk, and which was assigned by Fisk to the plaintiff's testator, Charles Wheelock, who, having died pending the suit, the plaintiff was substituted. The defendants purchased of Fisk a wagon shop in Booneville, Oneida, and gave the mortgage in question for $7,750, to secure the purchase price of the premises. The mortgage was dated April 20, 1857, and was conditioned to pay the above sum in lum-

ber wagons, made in a good, substantial, workmanlike manner, and of good material, so as to constitute a first-class lumber wagon of the kind heretofore used and made in Booneville, at the price of $70 per wagon with box, or $65 without box. These payments were to be made in installments of $1,000 each, except the last, $750. Fisk, the mortgagee, had carried on the wagon-making business in the shop up to the time he sold to the defendants.

These premises were, at the time of the sale to the defendants, incumbered by a mortgage executed by Fisk to one Whiting Tuttle. This mortgage, of course, belonged to Fisk to pay. It is provided in the mortgage given by the defendants to Fisk, that in case the payments due by the said Fisk, or which shall become due from him or his mortgage, executed to the said Whiting Tuttle, shall remain in arrear or unpaid, then the payments hereinbefore provided to be paid, may be suspended by the parties of the first part until the said Fisk shall pay the same; and in case the said incumbrance upon the premises shall not be extinguished by the said Fisk by the 15th May, 1860, then the said parties of the first part may suspend the payment due at that time, and any further payment, until the said mortgage to the said Tuttle shall be extinguished.

The case shows that all the payments were made as they fell due except the payment of $1,000, which fell due May 15, 1860, and the payment of $750, due June 15, 1860.

The wagons to meet these payments were made and completed in time, and the defendants were anxious to have the plaintiff's testator discharge the incumbrance created by the mortgage of Fisk to Tuttle. When the last $1,000 payment of May 15, 1860, fell due, the defendants had twenty wagons completed, which had been made to deliver on this mortgage. These wagons stood in the defendants' shop. On that day Fisk, who then held the mortgage, came to the defendants' shop and inquired if the wagons were ready for delivery, and was told by one of the defendants that they were. Fisk examined the wagons and said he was not ready to take them away, and asked the defendants to store them

for him, and he would afterward take them all away together.

It was agreed that the defendants should put them in store, and that Fisk would pay the defendants for their trouble.

The defendants took the wagons in pieces and put them into their barn. The defendants completed enough wagons before the 15th June to make the last payment of $750, and stored them with the others. All of these wagons, twenty-seven or twenty-eight in number, remained in the defendants' barn until the last of the ensuing October, when the defendants, having occasion to use the barn, removed them to Post's store-house, on the canal, and got them stored there. On the 22d May, before the last June payment fell due, Fisk assigned the bond and mortgage to Wheelock, but the defendants were not notified of the assignment until the last of June, 1860. These wagons were sufficient to make these two payments of $1,000 and $750, and they remained in Post's store-house until the 19th day of August, 1861, when the defendants served upon Wheelock a written notice that these wagons, to pay the mortgage, were at Post's store-house, ready for delivery, that they were thereby tendered to him, that the Tuttle mortgage was unpaid, that the defendants demanded satisfaction of their mortgage, and that unless he, Wheelock, satisfied that mortgage, and relieved them from the incumbrance of the Tuttle mortgage in ten days, legal proceedings would be taken. This store-house of Post was required for quarters for soldiers, and the defendants consulted Wheelock as to where they should be stored. Wheelock suggested that they be put in some buildings belonging to the defendants, to which the defendants assented, and they were put there. The defendants paid Post $20 for the storage of the wagons, and they claimed $10 for their own storage and trouble, and this Wheelock agreed to. These wagons remained then with the defendants until Wheelock procured a new security to the defendants against the incumbrance of the Tuttle mortgage, and that matter was adjusted and arranged satisfactorily between

the parties. Wheelock then demanded the wagons This was on the 20th of April, 1862. The defendants were ready and offered the wagons, but refused to pay the interest on these two payments for the two years in which the wagons were lying in store. This delay in completing the payment, was caused by the plaintiff's testators, and Fisk's neglect to pay the Tuttle mortgage or properly to arrange. We must assume that these wagons were not unconditionally tendered to Wheelock until the Fisk mortgage was arranged, as the referee has found that there was not any sufficient tender in 1860, and that the property remained with the defendants until April 30, 1862.

There was not, probably, a strictly technical tender in law until April 30, 1862, when there was legal tender, if the amount tendered was sufficient. There was no default before, by the terms of the mortgage, and, besides, the delay was acquiesced in by both Fisk and Wheelock all along, and the plaintiff's right to have the Tuttle mortgage removed acknowledged. Upon these facts the judge at Special Term held that there was no sufficient tender of the wagons to operate as a payment of the mortgage, and gave the plaintiff a judgment of foreclosure, and judgment was entered for the plaintiff, which was affirmed on appeal to the General Term, and from which the defendants have appealed to this court.

There is no principle of equity upon which this judgment can be sustained. The court below seems to have decided the case upon the strictly legal principle applicable to law of tender.

The plaintiff comes into court in this case, asking and invoking the equitable powers of the court to enforce payment of his mortgage, and he must be held subject to the maxim of equity, that " he who seeks equity must do equity." (1 Story's Eq. Jur. § 64 *e.*) The plaintiff, who is seeking relief in a court of equity, can claim no exemption from this rule.

Applying this rule to the case before us, I do not see how it is possible that these defendants can be required to pay interest upon these two payments during the time these

wagons were kept in store for the plaintiff. The defendants were obliged to complete the wagons and have them ready by the time, as he could not know whether the Tuttle mortgage would be discharged or not, and he was compelled to keep at all times ready for delivery, whenever the plaintiff should call for them, after having satisfied the Tuttle mortgage. The defendants had expended their money and labor in getting up these wagons, and the investment brought no return to them for the years they were kept in store waiting for Fisk and the plaintiff's testator to remove the incumbrance of the Tuttle mortgage from the premises. The terms of the defendants' purchase of the premises were, that the payment should be made in these wagons, of a particular description, and the duty rested upon the mortgagee, Fisk, to pay off, or at least to cause the incumbrance of that mortgage to be removed from the premises, and the right was secured in the mortgage to the defendants, to withhold these two last payments until that was done ; and the mortgage expressly provides that such suspension and withholding shall not be a breach of the condition of the mortgage. It is apparent, therefore, that there was no default made by the defendants in not unconditionally tendering these wagons at the day named. There was no default unless the refusal to pay the interest for these two years the wagons had been kept in store, operated as such. There is no principle of equity upon which the defendants can be required to pay interest while the wagons remained in store, waiting for the mortgagee, Fisk, and his assignee, Wheelock, to clear the title of the incumbrance resting upon it. The case is analogous to that of vendor and vendee of lands, where the purchaser has made deposit of the money to meet his purchase, and a delay ensues in consequence of vendor's inability or neglect to make a clear title, in which case it is held, that the purchaser shall not be required to pay interest pending such delay, if the money has laid idle. (Dart on Vendors, 59, 60; 2 Sug. on Vendors, 17, 18, 19.; *Powell* v. *Martyn*, 8 Ves. 146 ; *Winter* v. *Blades*, 2 Sim. & Stu. 393 ; *Brockenbrough* v. *Blythe*, 3 Leigh, 619.) This is the well-settled

rule where the money has been set aside for the vendor, and the purchaser has given the vendor notice or informed him of the fact.

The rule applies with still greater force to a case like the present, where the payment is to be made in an article of property which can in no possibility bring any return to the purchaser. The general principle, that interest is recoverable upon past due obligations for the payment of money, depends upon the debtor being in default. (*Rensselaer Glass Factory* v. *Reid*, 5 Cow. 611.) Interest is not a part of the debt, but something added to it by way of damages for the detention of the debt (*Stevens* v. *Barringer*, 13 Wend. 640), and while the obligation of debt remains, notwithstanding there may be circumstances when it is unlawful for the debtor to pay it for a time, yet the duty to pay still continues. Not so with the interest. It may be laid down as a general rule, that, whenever the law prohibits the payment of the principal, interest during the existence of the prohibition is not demandable.

This rule applies during the continuance of a status of war, where the party is restrained by injunction, or by attachment, from making the payment. (*Conn* v. *Penn*, 1 Pet. C. C. 524; *Hoon* v. *Allen*, 2 Dall. 102; *Stevens* v. *Barringer*, 13 Wend. 639; *Braintwait* v. *Halsey*, 4 Halst. 3; 4 Mass. 170; 2 Dall. 215; 1 Yeates, 274.)

And so when the principal debt is to be paid on a fixed day, and the party is required to do some act beneficial to the party, and such act is to be performed before the duty to pay becomes absolute, and the party is prepared with the funds at the day, and ready to make his payment, and deposits the money to make the payment, and notifies the other party of the fact, no interest can be claimed during the delay caused by the party's own fault.

The case before us falls within this rule. The defendants' payment must of necessity have been ready on the 15th May and June, 1860, respectively, as he could not know whether the holder of the mortgage would not remove the lien of Tuttle's mortgage, and they must necessarily keep

these wagons on hand ready to meet a demand for, as they could not tell when the call for them might occur.

It is true, the defendants might have made an unconditional tender on the pay day, but he was under no legal obligation to do so, and he would, by so doing, have surrendered important rights secured to him in the mortgage. This they were not required to do. This loss and injury, sustained by reason of these wagons remaining in store for nearly two years, and all the injury sustained by the plaintiff therefrom, is the consequence of the act of the plaintiff's testator, or Fisk, his assignor, and it does not lie with them or the plaintiff, who has succeeded to their rights, to complain of the loss of this amount of interest.

The defendants performed with punctuality and fidelity their obligation, and to charge the defendants with the loss of the interest on this capital of $1,750, tied up in these wagons, which they could not use, would be most unjust and unreasonable. The defendants invested their money ·and labor in these wagons, and had, in fact, this amount of capital invested in them, and, during these two years' suspension, they were losing the interest on the money invested in the wagons, and if they are required, during the same time, to pay interest to the plaintiff, they are made to pay double interest; and it is no sufficient answer to this to say, the defendants could have avoided this by delivering the wagons at once, and let the land they had paid for remain under an incumbrance to Tuttle, and take risk of Fisk's personal responsibility to remove, for this was not what the defendants bargained for. It is only necessary to apply to the plaintiff, in this case, the maxim of equity, that he who seeks equity must do equity, to reverse the judgment of the Supreme Court in this case, which should be done.

Judgment reversed.